# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER WAYNE STOKES,

        Defendant-Appellant.

FOR PUBLICATION
September 8, 2015
9:00 a.m.

No. 321303
Wayne Circuit Court
LC No. 13-007518-FC

Before: TALBOT, C.J., and WILDER and FORT HOOD, JJ.

TALBOT, C.J.

Christopher Wayne Stokes appeals as of right his jury trial convictions of carjacking[1] and armed robbery.[2] The trial court sentenced Stokes, as a second habitual offender,[3] to 18 to 30 years' imprisonment for each conviction. We affirm Stokes's convictions, but remand for further proceedings consistent with this opinion.

## I. FACTS

Stokes's convictions arise out of a carjacking that occurred near midnight on July 10, 2013. That night, Charles Jones drove into his driveway in Detroit. Stokes appeared and ordered Jones to hand over his car keys and cell phone. According to Jones, Stokes did so while pointing a pistol at Jones's head. Jones complied, and Stokes fled in Jones's vehicle. Stokes was charged with carjacking, armed robbery, and firearms offenses. At trial, Stokes presented several alibi witnesses. These witnesses generally testified that on the night of the carjacking, Stokes was at a hair salon in Oak Park, which was hosting a "tattoo party."[4] The jury found Stokes guilty of carjacking and armed robbery, but acquitted Stokes of the firearms offenses. Stokes now appeals as of right.

---

[1] MCL 750.529a(1).

[2] MCL 750.529.

[3] MCL 769.10.

[4] The witnesses testified that the salon hosted the party from 9:00 p.m. to midnight, and that Stokes was the tattoo artist providing tattoos at the salon.

## II. DISCUSSION

## A. JURY DELIBERATIONS

Stokes argues that he is entitled to a new trial because a juror engaged in misconduct, which Stokes alleges denied him his right to a fair and impartial trial. We disagree. Stokes raised this issue in a motion for a new trial, which the trial court denied. "A trial court's decision to deny a motion for a new trial is reviewed for an abuse of discretion. An abuse of discretion occurs only when the trial court chooses an outcome falling outside the principled range of outcomes."[5] We review de novo claims that a defendant was denied the Sixth Amendment right to an impartial jury.[6]

After the trial was complete, the attorneys and judge interviewed the jurors. During this interview, one juror disclosed that he conducted an experiment in his own home before deliberations were complete. This juror attempted to recreate the crime scene by pointing his own gun at a mirror. Although this juror did not share the results of the experiment with any other juror, Stokes argues that this experiment deprived him of a fair and impartial jury because the experiment influenced this single juror, who contributed to the verdict.

Consistent with a defendant's right to a fair and impartial jury, "jurors may only consider the evidence that is presented to them in open court."[7] "Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment."[8] To establish that the jury was influenced in a manner requiring reversal, a defendant must prove (1) that the jury was exposed to an extraneous influence, and (2) that this extraneous influence "created a real and substantial possibility that [it] could have affected the jury's verdict."[9]

In *People v Fletcher*, this Court explained:

> Traditionally, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict. The only recognized exception to this common-law rule related to situations in which the jury verdict was affected by extraneous influences. Stated differently, where there is evidence to suggest the verdict was affected by influences external to the trial proceedings, courts may consider juror testimony to impeach a verdict. However, where the alleged misconduct relates to influences

---

[5] *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (quotation marks, brackets, and citations omitted).

[6] *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012).

[7] *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997).

[8] *Id*.

[9] *Id*. at 88-89.

internal to the trial proceedings, courts may not invade the sanctity of the deliberative process.

* * *

The distinction between an external influence and inherent misconduct is not based on the location of the wrong, e.g., distinguished on the basis whether the "irregularity" occurred inside or outside the jury room. Rather, the nature of the allegation determines whether the allegation is intrinsic to the jury's deliberative process or whether it is an outside or extraneous influence.[10]

In *Fletcher*, the jurors collectively reenacted the crime scene in the jury room using the gun that the defendant had used to commit the crime.[11] This Court found that this reenactment was not an extraneous influence because it "was closely intertwined with the deliberative process and was not premised on anything other than the jurors' collective account of the evidence presented in open court."[12] Similarly, in this case, the juror's experiment was closely intertwined with his deliberative process. The juror's experiment was an attempt to recreate the crime scene, apparently aimed at discovering how the crime was committed. Nothing indicates that the experiment was premised on anything beyond this juror's memory of the testimony. Accordingly, the experiment was not an extraneous influence, and cannot be a basis for attacking the jury's verdict.

Stokes relies on *Doan v Brigano*[13] as support. In *Doan*, a juror conducted an experiment in her home to determine if the defendant's testimony was truthful.[14] The juror then shared the results of her experiment with the rest of the jury.[15] The Sixth Circuit concluded that this experiment was an improper extraneous influence on the jury because by sharing the results of this experiment, the juror brought extraneous facts before the jury.[16] The present case is distinguishable. The juror in the instant matter did not share the results of his experiment with any other jurors, and thus, no extraneous facts were brought into the jury room. Because the juror that conducted the experiment did not "testify" as an expert witness to the other jurors, the

---

[10] *People v Fletcher*, 260 Mich App 531, 539, 541; 679 NW2d 127 (2004) (quotation marks, brackets, and citations omitted).

[11] *Id*. at 537.

[12] *Id*. at 542.

[13] *Doan v Brigano*, 237 F3d 722 (CA 6, 2001), abrogated on other grounds by *Wiggins v Smith*, 539 US 510; 123 S Ct 2527; 156 L Ed 2d 471 (2003).

[14] *Id*. at 726-727.

[15] *Id*. at 727.

[16] *Id*. at 734-736. Ultimately, the *Doan* court denied relief, concluding that the error was harmless. *Id*. at 736-739.

experiment does not amount to an extraneous influence.[17]  Accordingly, Stokes is not entitled to relief.

## B. *BRADY* VIOLATION

Stokes next argues that the prosecution violated the rule of *Brady v Maryland*[18] by failing to disclose various pieces of evidence.  Stokes also argues that trial counsel was ineffective for failing to request access to Stokes's cell phone until the first day of trial.  We disagree.

This Court reviews due process claims, such as allegations of a *Brady* violation, de novo.[19]  "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law."[20]  A trial court's factual findings, if any, are reviewed for clear error.[21]  The ultimate question of whether counsel was ineffective is a constitutional issue reviewed de novo.[22]

"A defendant has a due process right of access to certain information possessed by the prosecution."[23]  A *Brady* violation occurs if: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material."[24]  "The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith."[25]  "Evidence is favorable to the defense when it is either exculpatory or impeaching."[26]  "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[27]

Stokes argues that the prosecutor committed a *Brady* violation by failing to provide Stokes with access to his own cell phone.  On the first day of trial, Stokes's counsel requested access to the cell phone in order to find contact information for the individual who prepared a flyer advertising the tattoo party.  The prosecutor agreed to allow defense counsel to view the

---

[17] *Fletcher*, 260 Mich App at 543.

[18] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[19] *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007).

[20] *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

[21] *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).

[22] *Id*.

[23] *People v Fox*, 232 Mich App 541, 549; 591 NW2d 384 (1998), citing *Brady*, 373 US 83.

[24] *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014).

[25] *Id*. at 150 (citations omitted).

[26] *Id*.

[27] *Id*. (quotation omitted).

cell phone for this purpose. The following day, defense counsel acknowledged that she obtained the contact information from another source and that the witness was being interviewed. The same witness testified at trial.

Stokes's claims fail for a variety of reasons. First, the record does not support Stokes's assertion that the cell phone was not provided to him. When Stokes requested access to the cell phone, the prosecutor offered to make it available. The record does not establish whether the cell phone was ever provided to Stokes. Stokes now asserts that the cell phone was lost by police or the prosecutor and never provided to him. The only mention of the cell phone having been lost appears in a statement by defendant's appellate counsel during a hearing held in the trial court regarding Stokes's motion for a new trial. It appears that counsel, after reviewing the transcripts, simply assumed that the cell phone was lost when no mention of it was made after the first day of trial. We refuse to adopt this assumption, which has no apparent basis in the record. Stokes has not established that the prosecutor actually suppressed evidence.

Nor has Stokes satisfied the third prong by demonstrating that the cell phone contained material information that could have altered the outcome of the trial. To succeed on his claim, Stokes must demonstrate that the cell phone contained evidence that, had it been disclosed, would have been reasonably likely to lead to a different result.[28] Stokes first argues that the cell phone contained contact information for the individual who prepared the flyer. However, Stokes obtained this information from another source, and the witness testified at trial. Stokes also argues that the cell phone contains a tracking program that could have shown his location on the night of the carjacking. However, Stokes provides no evidence of what information this tracking program would have provided, nor does he explain why the cell phone was necessary to obtain the information. Stokes also asserts that the cell phone contained "additional alibi information," but fails to explain what information this was. We simply have no basis to conclude that the cell phone contained any information that was reasonably likely to lead to a different result in this case.

Stokes also argues that trial counsel was ineffective for failing to seek access to the cell phone until the day of trial, at which point Stokes assumes the cell phone had been lost. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise."[29] "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different."[30] As our Supreme Court has recognized, the materiality prong of the *Brady* test requires the same showing of prejudice required to establish ineffective assistance of counsel.[31]

---

[28] *Id.*

[29] *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010).

[30] *Id.*

[31] *Chenault*, 495 Mich at 159.

As Stokes cannot demonstrate that any material evidence was withheld, he cannot demonstrate that any failure by his attorney to seek this evidence earlier warrants relief.

## C. SENTENCING ERROR

Next, Stokes argues that, pursuant to *Alleyne v United States*,[32] his Sixth Amendment right to a jury trial was violated when the trial court made factual determinations to determine Stokes's minimum sentence. We agree. "A Sixth Amendment challenge presents a question of constitutional law that this Court reviews de novo."[33]

Michigan's legislatively enacted sentencing scheme requires a trial court to score a number of variables that take into account a defendant's past criminal history and the circumstances of the crime.[34] Using the resulting scores, trial courts must then determine the appropriate range for a defendant's minimum sentence, using the appropriate sentencing grid.[35] Crucially, when scoring the variables, trial courts are permitted to make factual findings which need only be supported by a preponderance of the evidence.[36] Until recently, under the guidelines as enacted by our Legislature, trial courts were required to impose a minimum sentence falling within the calculated range, unless the trial court was able to articulate a substantial and compelling reason warranting a departure from this range.[37]

In *People v Lockridge*, our Supreme Court held that Michigan's sentencing scheme violates the Sixth Amendment right to a jury trial because it requires "judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range, i.e., the 'mandatory minimum' sentence under *Alleyne*."[38] Precisely such a violation occurred in this case. Although

---

[32] *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013).

[33] *People v Lockridge*, ___ Mich ___, ___; ___ NW2d ___ (2015); slip op at 11.

[34] See *People v Smith*, 482 Mich 292, 305; 754 NW2d 284 (2008). As the Court explained, "the very purpose of the sentencing guidelines is to facilitate proportionate sentences." *Id*.

[35] See MCL 777.61 to MCL 777.69; *Lockridge*, ___ Mich at ___; slip op at 2 ("[A] sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence.").

[36] *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

[37] MCL 769.34(2) ("the minimum sentence imposed by a court . . . shall be within the appropriate sentence range . . . ."); MCL 769.34(3) ("A court may depart from the appropriate sentence range established under the sentencing guidelines . . . if the court has a substantial and compelling reason for that departure . . . ."). See also *Lockridge*, ___ Mich at ___; slip op at 24 ("The guidelines minimum range *is* binding on trial courts, absent their articulating substantial and compelling reasons for a departure.").

[38] *Lockridge*, ___ Mich at ___; slip op at 1-2. See also *id*. at ___; slip op at 36 ("Because Michigan's sentencing guidelines scheme allows judges to find by a preponderance of the

-6-

the jury acquitted Stokes of both firearms charges brought against him, the trial court scored OVs 1 and 2 as if Stokes possessed a pistol and pointed it at Jones.[39] If no points are assigned to these variables, Stokes's OV level drops from Level III to Level II, and his minimum sentence range under the guidelines would be reduced from a range of 126 to 262 months to a range of 108 to 225 months.[40] Thus, it cannot be disputed that the trial court relied on facts not admitted by Stokes or found by the jury in order to calculate his sentencing guidelines range, and that these judicially-found facts resulted in an increased minimum sentencing range. As such, under *Lockridge*, Stokes's Sixth Amendment rights were violated at sentencing.

In *Lockridge*, our Supreme Court contemplated several possible methods to remedy this constitutional defect. One potential remedy considered by the Court was "to require juries to find the facts used to score all the OVs that are not admitted or stipulated by the defendant or necessarily found by the jury's verdict."[41] Stokes requests such a remedy here: he asks this Court to remand for resentencing, but with no points assigned to OVs 1 and 2, such that his minimum sentence would fall between 108 and 225 months. He asks that the trial court be required to sentence him within this reduced range, absent a substantial and compelling reason warranting a departure. However, our Supreme Court "reject[ed] this option[]" because requiring all facts utilized in the sentencing guidelines to either be found by a jury or admitted by the defendant would "essentially turn sentencing proceedings into mini-trials[,]" and "[t]he constitutional violation c[ould] be effectively remedied without burdening our judicial system in this manner . . . ."[42] Thus, we cannot grant Stokes the remedy he seeks.

Rather, because the rule of *Alleyne* only applies to judicial fact-finding that *mandatorily* increases a minimum sentence,[43] our Supreme Court concluded that the appropriate remedy was to render Michigan's sentencing guidelines merely advisory.[44] The Court did so through a "judicial rewriting of the statute," "substitut[ing] the word 'may' for 'shall' in MCL 769.34(2) and remov[ing] the requirement in MCL 769.34(3) that a trial court that departs from the

---

evidence facts that are then used to compel an increase in the mandatory minimum punishment a defendant receives, it violates the Sixth Amendment to the United States Constitution under *Alleyne*.").

[39] Specifically, the trial court assigned 15 points to OV 1 for pointing a firearm at Jones, MCL 777.31(c), and 5 points to OV 2 for possessing a pistol, MCL 777.32(d), for a total of 20 points.

[40] See MCL 777.62.

[41] *Lockridge*, ___ Mich at ___; slip op at 26.

[42] *Id*.

[43] See *id*. at ___; slip op at 1-2; *Alleyne*, 133 S Ct at 2155.

[44] *Lockridge*, ___ Mich at ___; slip op at 36 ("To remedy the constitutional flaw in the guidelines, we hold that they are advisory only."). Our Supreme Court adopted this remedy from *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005). *Lockridge*, ___ Mich at ___; slip op at 28-30.

applicable guidelines range must articulate a substantial and compelling reason for that departure."[45] Thus, in effect, MCL 769.34(2) now reads:

> (2) Except as otherwise provided in this subsection or for a departure from the appropriate minimum sentence range provided for under subsection (3), the minimum sentence imposed by a court of this state for a felony enumerated in part 2 of chapter XVII committed on or after January 1, 1999 [may] be within the appropriate sentence range under the version of those sentencing guidelines in effect on the date the crime was committed.[46]

In effect, MCL 769.34(3) now reads, "A court may depart from the appropriate sentence range established under the sentencing guidelines set forth in chapter XVII[.]"[47]

Our Supreme Court was careful to state that the sentencing guidelines must still be scored, and that trial courts must assess the "highest number of points possible" to each variable, "whether using judge-found facts or not."[48] Trial courts must "continue to consult the applicable guidelines range and take it into account when imposing a sentence."[49] Thus, under *Lockridge*, while the sentencing guidelines must still be scored by the trial court, the resulting range is merely an advisory range that must be taken into account by the trial court when imposing a sentence.[50] "When a defendant's sentence is calculated using a guidelines minimum sentence range in which OVs have been scored on the basis of facts not admitted by the defendant or found beyond a reasonable doubt by the jury, the sentencing court may exercise its discretion to depart from that guidelines range without articulating substantial and compelling reasons for doing so."[51] As explained by our Supreme Court, "[b]ecause sentencing courts will hereafter not be *bound* by the applicable sentencing guidelines range, this remedy cures the Sixth Amendment flaw in our guidelines scheme by removing the unconstitutional constraint on the court's discretion."[52]

In *Lockridge*, our Supreme Court instructed courts regarding how to proceed "in the many cases that have been held in abeyance for this one."[53] Noting that "virtually all" of these cases involve unpreserved challenges, our Supreme Court described a procedure, the goal of

---

[45] *Lockridge*, ___ Mich at ___; slip op at 28.

[46] MCL 769.34(2); *Lockridge*, ___ Mich at ___; slip op at 28.

[47] MCL 769.34(3); *Lockridge*, ___ Mich at ___; slip op at 28.

[48] *Lockridge*, ___ Mich at ___; slip op at 28-29 and n 28.

[49] *Id*. at ___; slip op at 29.

[50] *Id*. at ___; slip op at 29 and n 28.

[51] *Id*. at ___; slip op at 29.

[52] *Id*.

[53] *Id*. at ___; slip op at 31-32.

-8-

which is to determine whether a *Lockridge* error resulted in prejudice to any given defendant.[54] Such an inquiry is necessary because *unpreserved* constitutional errors are subject to plain-error review, which requires a defendant to demonstrate not only that an error occurred, but that "the error affected the outcome of the lower court proceedings."[55] Our Supreme Court held that if a defendant is able to "establish a threshold showing of the potential for plain error," the case must "be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error. If the trial court determines that the answer to that question is yes, the court shall order resentencing."[56] The precise procedure to be followed, modeled on that adopted in *United States v Crosby*,[57] is as follows:

> [O]n a *Crosby* remand, a trial court should first allow a defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present, as required by [MCR 6.425], if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should consider only the circumstances existing at the time of the original sentence.[58]

However, in this case, Stokes preserved his claim of error by raising the issue in the trial court.[59] "[C]onstitutional error such as occurred here must be classified as either structural or nonstructural. If the error is structural, reversal is automatic. If the constitutional error is not

---

[54] *Id*. at ___; slip op at 32-36.

[55] *Id*. at ___; slip op at 30.

[56] *Id*. at ___; slip op at 33-34. The Court determined that a "threshold showing of the potential for plain error" is made in "cases in which facts admitted by a defendant or found by a jury verdict were *insufficient* to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced[,]" and the trial court did not impose a sentence that was an upward departure from the guidelines range. *Id*. at ___; slip op at 32-33. That is the precise scenario now before us. Thus, had Stokes failed to preserve his claim of error, the *Crosby* remand procedure would clearly be required.

[57] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

[58] *Lockridge*, ___ Mich at ___; slip op at 35-36 (quotation marks and citations omitted).

[59] See *People v Loper*, 299 Mich App 451, 456; 830 NW2d 836 (2013). The trial court denied relief, relying on this Court's opinion in *People v Herron*, 303 Mich App 392; 845 NW2d 533 (2013), overruled by *Lockridge*, ___ Mich at ___; slip op at 12-13, 36.

structural, it is subject to the harmless beyond a reasonable doubt test."[60] A *Lockridge* error is not structural,[61] and thus, must be reviewed for harmless error.

We conclude that, in order to determine whether the error in this case was harmless, the *Crosby* remand procedure must be followed. First and foremost, the Court's opinion in *Lockridge* supports this conclusion. In *Lockridge*, our Supreme Court cited with approval the following language from *Crosby*:

> "A remand for determination of *whether* to resentence is appropriate in order to undertake a proper application of the plain error *and harmless error* doctrines. Without knowing whether a sentencing judge would have imposed a materially different sentence, . . . an appellate court will normally be unable to assess the significance of any error that might have been made. . . .
>
> Obviously, any of the errors in the procedure for selecting the original sentence discussed in this opinion would be *harmless*, and not prejudicial under plain error analysis, if the judge decides on remand, in full compliance with now applicable requirements, that . . . the sentence would have been essentially the same as originally imposed. Conversely, a district judge's decision that the original sentence would have differed in a nontrivial manner from that imposed will demonstrate that the error in imposing the original sentence *was harmful* and satisfies plain error analysis."[62]

Unfortunately, our analysis is not as simple as applying this language as it reads. In the same year the Second Circuit Court of Appeals decided *Crosby*, the same court decided *United States v Lake*.[63] In *Lake*, the court held that, with respect to *preserved* sentencing errors of the type now at issue, the *Crosby* procedure does not apply.[64] The Second Circuit described its own references to harmless error in *Crosby* as merely dicta, and held that an intervening case, *United States v Fagans*,[65] "abrogated the dictum in *Crosby* that had indicated that a *Crosby* remand would be appropriate for application of the harmless error doctrine as well as the plain error doctrine."[66] The court stated that "the issue upon review of the preserved error is whether we should affirm, if the Government has shown the error to be harmless, or remand for resentencing,

---

[60] *People v Duncan*, 462 Mich 47, 51; 610 NW2d 551 (2000) (citations omitted).

[61] *Lockridge*, ___ Mich at ___; slip op at 30 n 29.

[62] *Id*. at ___; slip op at 33, quoting *Crosby*, 397 F3d at 117-118 (some emphasis added; footnote omitted).

[63] *United States v Lake*, 419 F3d 111 (CA 2, 2005).

[64] *Id*. at 113-114 and n 2.

[65] *United States v Fagans*, 406 F3d 138 (CA 2, 2005).

[66] *Lake*, 419 F3d at 113 n 2.

if such a showing has not been made."[67]  That the Second Circuit has repudiated *Crosby* to the extent it held that its remand procedure applies to preserved claims raises the question of whether this Court should do the same.

But given that our Supreme Court specifically expressed its "agreement with" the quoted analysis stated in *Crosby*,[68] we believe our Supreme Court intended that the *Crosby* procedure would apply to both preserved and unpreserved errors.  Notably, our Supreme Court did not acknowledge or address *Lake* or any other cases discussing how to proceed with preserved errors of the nature at issue here.  And although *Lockridge* concerned an unpreserved claim of error, the portion of the Court's opinion in which the above analysis appears is a section explicitly devoted to describing the appropriate procedure to be followed in cases, such as this one, involving pre-*Lockridge* sentencing errors.  Thus, we cannot say that our Supreme Court's reference to this language was merely dicta.

As a practical matter, we also see no reason why if the *Crosby* procedure is necessary to resolve unpreserved claims, it would not likewise be necessary to follow the procedure to resolve preserved claims.  Ultimately, the purpose of a *Crosby* remand is to determine what effect *Lockridge* would have on the defendant's sentence, so that it may be determined whether any prejudice resulted from the error.[69]  Similarly, we cannot say with certainty that the error was or was not harmless without knowing what sentence would result had the trial court "been aware that the guidelines were merely advisory."[70]  Perhaps the largest difference between establishing prejudice under the plain-error test and the harmless error test is on which party the burden lies.  Under the plain error test, the burden lies with the defendant to demonstrate that the "error affected the outcome of the lower court proceedings."[71]  But when a constitutional error is preserved, the burden falls on "the beneficiary of the error," here, the prosecution, to "establish[] that it is harmless beyond a reasonable doubt."[72]  Yet whether this Court's review is for plain error or for harmless error, the overriding question is the same: what effect, if any, did the error have on the lower court proceedings?  Where the burden falls does not change the nature of the inquiry.  We see no logical reason why the *Crosby* remand procedure should apply to unpreserved errors, but not to preserved errors.

Further, the *Crosby* procedure offers a measure of protection to a defendant.  As the first step of this procedure, a defendant is provided with an opportunity "to avoid resentencing by

---

[67] *Id.*

[68] *Lockridge*, ___ Mich at ___; slip op at 33.

[69] See *id.* at ___; slip op at 32-34.

[70] *Id.* at ___; slip op at 32 n 31.

[71] *Id.* at ___; slip op at 30.

[72] *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

-11-

promptly notifying the trial judge that resentencing will not be sought."[73] We believe this step is particularly important because, given the sentencing discretion now afforded to trial courts, Stokes faces the possibility of receiving a more severe sentence on resentencing.[74] Although Stokes raised his challenge in the trial court and has pursued the issue on appeal, his desired remedy was resentencing with a lower, but still mandatory, guidelines range. While Stokes has ultimately prevailed on his claim of constitutional error, we do not assume that he is satisfied with the remedy available to him. If we were to simply remand for resentencing, we would deprive Stokes of the opportunity to avoid resentencing if that is his desire. In that sense, we would be punishing Stokes for preserving his claim of error.[75]

Thus, in this case, we remand the matter to the trial court to follow the *Crosby* procedure in the same manner as outlined in *Lockridge* for unpreserved errors. Stokes may elect to forego resentencing by providing the trial court with prompt notice of his intention to do so.[76] If "notification is not received in a timely manner," the trial court shall continue with the *Crosby* remand procedure as explained in *Lockridge*.[77]

---

[73] *Lockridge*, ___ Mich at ___; slip op at 35 (quotation and brackets omitted). Our Supreme Court did not define what constitutes "prompt notification" by a defendant in the context of a *Crosby* remand. *Id*. Certainly, the question of what constitutes timely notice may arise in a future case, particularly if a trial court were to deem a notice untimely, and then proceed to resentence a defendant to a more severe sentence. However, that issue is not presently before the Court. Thus, we decline to address the question at this juncture.

[74] See *Crosby*, 397 F3d at 117 ("[A] change in cases of sentences below a statutory maximum might yield a higher sentence . . . ."); *United States v Regalado*, 518 F3d 143, 149 (CA 2, 2008) ("*Crosby* recognized that a resentencing might yield a higher sentence."). See also *Alabama v Smith*, 490 US 794, 798; 109 S Ct 2201; 104 L Ed 2d 865 (1989) (a higher sentence on resentencing is permissible so long as the trial court is not motivated by vindictiveness against a defendant for having succeeded on appeal). We note that the trial court must make its initial determination of whether to resentence a defendant based on the " 'circumstances existing at the time of the original sentence.' " *Lockridge*, ___ Mich at ___; slip op at 36, quoting *Crosby*, 397 F3d at 117. However, if resentencing occurs, the trial court may rely on new information to justify a more severe sentence. *People v Mazzie*, 429 Mich 29, 36-37; 413 NW2d 1 (1987). See also *People v Colon*, 250 Mich App 59, 66; 644 NW2d 790 (2002) ("When a defendant is resentenced by the same judge and the second sentence is longer than the first, there is a presumption of vindictiveness. That presumption may be overcome if the trial court enunciates reasons for doing so at resentencing.").

[75] We reiterate that if Stokes had not preserved his claim, the *Crosby* procedure would clearly be applicable here. See n 56 *supra*.

[76] *Lockridge*, ___ Mich at ___; slip op at 35.

[77] *Id*. at ___; slip op at 35-36.

## D. FAILURE TO REQUEST JURY INSTRUCTIONS[78]

Stokes argues that he was denied effective assistance of counsel because his trial counsel failed to request two jury instructions. We disagree.

Stokes first argues that his trial counsel was ineffective for failing to request that the jury be provided with M Crim JI 4.4. In relevant part, this instruction states that evidence of flight "does not prove guilt. A person may run or hide for innocent reasons, such as panic, mistake, or fear. However, a person may also run or hide because of a consciousness of guilt."[79] The jury is then instructed that it "must decide whether the evidence is true, and, if true, whether it shows that the defendant had a guilty state of mind."[80]

Officer Theodore Jackson arrested Stokes after a traffic stop, and testified that Stokes stated he was moving to Flint. Jackson also testified that he found "[s]everal bags of clothes and shoes; socks and toothbrush; everything," in the car. However, Jackson did not put this information in his written report. At trial, defense counsel attempted to establish that perhaps Jackson was mistaken that Stokes had planned to move to Flint, pointing out that he had made several other arrests since he arrested Stokes.

To establish that counsel was ineffective, Stokes must overcome a "strong presumption that counsel's assistance constituted sound trial strategy."[81] Stokes cannot overcome this presumption. The prosecutor did not place much emphasis on Stokes's attempted flight, and defense counsel's strategy was to imply that Jackson had confused Stokes's arrest with that of another individual. Instructing the jury regarding evidence of flight would have drawn further attention to evidence that was not favorable to Stokes. Under the circumstances, Stokes cannot overcome the presumption that counsel's decision not to request the instruction was sound trial strategy.

Stokes also argues that counsel was ineffective for failing to request an alibi instruction. Given that Stokes largely relied on an alibi defense, it is unclear why counsel failed to request an alibi instruction. But even assuming the failure to request the instruction was objectively unreasonable, Stokes cannot demonstrate a reasonable probability of a different result had the instruction been provided. The trial court appropriately instructed the jury regarding the prosecutor's burden of proof and the elements of the crime. The trial court also thoroughly instructed the jury regarding the prosecutor's burden to prove that Stokes was the individual who committed the crime and how to consider identification evidence. Under similar circumstances, this Court has explained:

---

[78] This and the remaining issues discussed have been raised by Stokes in his Standard 4 Brief on Appeal.

[79] M Crim JI 4.4(2).

[80] M Crim JI 4.4(3).

[81] *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011).

The failure to give an alibi instruction is not error requiring reversal where the court properly instructs on the elements of the charged offense and the prosecutor's burden of proof. Consistent with this principle, where, as here, these instructions were given, the absence of an alibi instruction would not have a reasonable probability of affecting the outcome of the trial. Therefore, we conclude defendant was not denied the effective assistance of counsel.[82]

For the same reasons, Stokes was not denied the effective assistance of counsel due to the failure to request an alibi instruction.

### E. FAILURE TO INVESTIGATE

Stokes next argues that counsel was ineffective for failing to interview any of the prosecutor's witnesses and for failing to investigate another man, "Andre." We disagree. A defendant raising a claim of ineffective assistance of counsel bears the burden of proving the factual predicate of his or her claim.[83] To support his assertions, Stokes relies only on affidavits attached to his pro se appellate brief. But because Stokes did not preserve this claim in the trial court, "our review is limited to errors apparent on the record."[84] As there is no available record which would establish that trial counsel failed to interview or investigate these witnesses, Stokes's claim necessarily fails.

### F. RIGHT TO PRESENT A DEFENSE

Stokes next argues that his constitutional right to present a defense was violated when the trial court ruled that his trial counsel could not, in closing argument, specifically implicate another individual, "Andre,"[85] as the man who committed the carjacking. We disagree. This Court reviews "de novo the question whether a defendant was denied the constitutional right to present a defense."[86] "This Court reviews the trial court's ruling with regard to closing arguments for an abuse of discretion."[87]

Antawon Wright is Stokes's younger brother, and lives with Stokes. The two share a bedroom. During a search of Stokes's home, police recovered Jones's stolen cell phone from this bedroom. Wright testified that he bought this cell phone from Andre, who also lived in the home. Based on this evidence, Stokes's attorney sought to argue that it was Andre, not Stokes,

---

[82] *People v Sabin (On Second Remand)*, 242 Mich App 656, 660; 620 NW2d 19 (2000) (citation omitted).

[83] *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

[84] *Matuszak*, 263 Mich App at 48.

[85] Andre's last name is not disclosed in the record.

[86] *People v Unger*, 278 Mich App 210, 247; 749 NW2d 272 (2008).

[87] *People v Lacalamita*, 286 Mich App 467, 472; 780 NW2d 311 (2009).

who committed the carjacking and robbery. The trial court denied the request because it "did not feel that the evidence adduced during the trial would support such an inference."

"The purpose of closing argument is to allow attorneys to comment on the evidence and to argue their theories of the law to the jury."[88] Thus, "[c]losing argument is not the time to introduce new evidence."[89] However, an attorney may argue the facts and all reasonable inferences arising from the evidence admitted at trial.[90] Under the circumstances, the trial court abused its discretion when it refused to allow defense counsel to specifically argue that Andre was the individual who committed the crimes. Because Jones's cell phone was taken from Jones during the carjacking, and Wright had testified that Andre sold the same cell phone to him, a rational inference could be drawn that Andre was the individual that committed the carjacking. This was not an attempt to add new evidence to the trial; it was a permissible attempt to argue a reasonable inference from the evidence adduced at trial.

However, this error did not deprive Stokes of his right to present a defense. " 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.' "[91] Stokes received a meaningful opportunity to present a complete defense. The relevant evidence was presented to the jury. Stokes's trial counsel, while not allowed to specifically reference Andre, was permitted to extensively argue that Stokes was not the individual who committed the crimes. Counsel argued that Jones had incorrectly identified Stokes, pointing to various discrepancies in Jones's testimony and facts that might have affected Jones's ability to see his assailant. Counsel also discussed the cell phone recovered from Stokes's bedroom. Counsel pointed out that Wright had testified to purchasing the cell phone from Andre, and then asked the jury to consider why police had not investigated "another male" that lived in the home. The only men that lived in the home were Stokes, Wright, and Andre. Thus, given the preceding arguments made by counsel, counsel's reference to "another male" living in the home clearly implied the possibility that Andre committed the crimes. Stokes was not deprived of a meaningful opportunity to present a complete defense.[92]

---

[88] *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987).

[89] *Id*.

[90] See *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).

[91] *Unger*, 278 Mich App at 249, quoting *Holmes v South Carolina*, 547 US 319, 324; 126 S Ct 1727; 164 L Ed 2d 503 (2006).

[92] For the same reasons, while the trial court abused its discretion by failing to allow Stokes to point to Andre specifically, this error was harmless, and does not warrant reversal. See *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (claims of preserved, nonconstitutional error do not warrant reversal unless "it is more probable than not that a different outcome would have resulted without the error.").

## G.  PRELIMINARY EXAMINATION

Stokes next argues that counsel was ineffective for failing to contest the circuit court's jurisdiction over Stokes.  We disagree.

"Due process requires that the trial of criminal prosecutions should be by a jury of the county or city where the offense was committed, except as otherwise provided by the Legislature."[93]  At Stokes's preliminary examination, Jones testified that the crime occurred in Detroit.  No evidence was admitted specifically demonstrating that Detroit is situated in Wayne County.  Stokes argues that because it was not established that Detroit is located within Wayne County, it was not established that the Wayne Circuit Court was the proper court to conduct his criminal trial.  The district and circuit courts could take judicial notice of the fact that Detroit is situated within the borders of Wayne County.[94]  Counsel was not ineffective for failing to raise such a trivial point in the trial court.[95]

## H.  CUMULATIVE ERROR

Finally, Stokes argues that "[a]ll of the errors that riddled" his trial deprived him of the right to a fair trial.  We disagree.  "[T]he cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not."[96]  But with the exception of the sentencing error previously discussed, Stokes has failed to demonstrate the existence of any errors that resulted in prejudice.  Thus, while Stokes is entitled to relief with regard to his claim of sentencing error, no further relief is warranted.

---

[93] *People v Webbs*, 263 Mich App 531, 533; 689 NW2d 163 (2004) (quotation omitted).

[94] See MRE 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); MRE 201(e) ("Judicial notice may be taken at any stage of the proceeding.").  See also *People v Burt*, 89 Mich App 293, 297-298; 279 NW2d 299 (1979) (taking judicial notice of the fact that "no football game between Washington and Dallas, or between any other professional football teams, was televised on . . . December 24, 1976.").

[95] See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

[96] *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002).

## III.  CONCLUSION

We affirm Stokes's convictions, but remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.[97]

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Karen M. Fort Hood

---

[97] As noted by our Supreme Court in *Lockridge*, two federal circuit courts have adopted a remand procedure similar to the *Crosby* procedure, "although modifying it so that the appellate court retains jurisdiction throughout the limited remand, and thus it is the *appellate court* that will vacate the sentence upon being notified by the judge that he would not have imposed it had he known that the guidelines were merely advisory." *Lockridge*, ___ Mich at ___; slip op at 34 n 33 (quotation marks and citations omitted).  That our Supreme Court acknowledged such a procedure, but did not adopt it, is informative.  When an appellate court orders a *Crosby* remand, it should not retain jurisdiction.  See *id*.