# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANGELO DIANGELO,

Defendant-Appellant.

UNPUBLISHED
February 2, 2017

No. 327745
Oakland Circuit Court
LC No. 2014-252092-FH

---

Before: GADOLA, P.J., and BORRELLO and STEPHENS, JJ.

PER CURIAM.

A jury convicted defendant of failure to stop at the scene of an accident that resulted in death (failure to stop), MCL 257.617(3). The trial court sentenced defendant to 38 months to 15 years' imprisonment, with credit for 84 days served. For the reasons set forth in this opinion, we affirm defendant's conviction and remand this case to the trial court for a *Crosby*[1] hearing in accord with *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015).

## I. FACTS

This case involves a collision between a vehicle and a pedestrian that occurred on the morning of June 28, 2014, on I-75 northbound in Oakland County, Michigan. Ernest Carter, the victim, was employed as a semi-truck driver and was driving his semi-truck northbound on I-75 on June 28, 2014. Around 4:20 or 4:30 a.m., while he was driving, the victim called his wife, Elizabeth Carter, they had a conversation about an upcoming vacation. Elizabeth testified that, while she was on the telephone with the victim, he told her that another driver on the highway was flashing his lights and honking his horn to get the victim's attention. Elizabeth testified that the victim rolled down his window, and she heard the other driver say, "Sir, do you know you do not have no lights on your trailer?" According to Elizabeth, the victim told her that he "pulled over" his semi-truck and would call her "right back."

---

[1] *United States v Crosby*, 397 F3d 103, 117-118 (CA 2, 2005).

-1-

Around 4:40 a.m. that morning, Misty Erpelding was driving northbound on I-75 when she saw a semi-truck "pulled off to the shoulder" with its hazard lights flashing. Erpelding testified that she was driving in the right-most lane, and she changed lanes to distance herself from the truck. According to Erpelding, after she passed the truck, she "noticed there was a body in the road," and she "swerved" to the left to avoid hitting it. Erpelding testified that she called 911 "a couple seconds" later.

At 4:43 a.m., Officer Mariusz Skonski testified that, when he arrived on the scene, he observed a semi-truck parked "off onto the shoulder, with the headlights on and flashing lights on or hazard lights on." Officer Skonski testified that he also observed a body—the victim— lying in front of the truck "between the two right lanes." Officer Skonski testified that he believed the victim was deceased and he did not check for a pulse because "it was obvious that there was no reason for me to be assisting him, medically." According to Officer Skonski, there were no other vehicles at the scene when he arrived and he believed he was dealing with a "hit and run."

Dr. Knu Virani, the Deputy Chief Medical Examiner in Oakland County, examined the victim's body. According to Dr. Virani, the victim suffered numerous fatal injuries consistent with being hit by a car. According to Dr. Virani, the height of the victim's injuries indicated that the victim's legs "were impacted by the vehicle in a straight way without any application of the brakes at that time" and that the victim "was in a turning motion" at the time he was hit. Dr. Virani also testified that the victim's facial injuries were typical of injuries sustained "when the face or the part of the body is coming into contact with some broken glass surface, particularly like a windshield."

During the ensuing police investigation, detectives were able to reconstruct the crash scene. Timothy Brown, a consultant specializing in crash reconstruction and collision analysis who assisted the Auburn Hills Police Department with the investigation in this case, testified that he reviewed photographs, maps, and drawings of the scene to identify a "cone of debris" left during the collision. Brown testified that the victim was on the shoulder of the road—to the right of the fog line—and about 30 to 40 feet behind the semi-truck when he was hit. According to Brown, the victim "rotate[d], his legs [were] taken out from underneath him, he [went] up over the top of the car," and "the vehicle continued out from underneath him." Brown and another investigator agreed that the vehicle did not brake when it hit defendant.

Police were able to determine that the vehicle involves was a silver 2013 or 2014 Ford Focus missing a mirror on the passenger side and parts of the bumper and grill, including a "triangular part of the grill." Detective Thomas, with the help of Ford and the Secretary of State, created a list of 200 silver Ford Focuses located in the five counties surrounding the area where the collision took place. Detective Thomas testified that he helped create fliers containing information about the suspect vehicle, and he sent the fliers to Ford dealerships, car repair shops, and other police departments in the surrounding areas.

Defendant's nephew, David Warren, testified that he visited defendant at his home on June 28, 2014, the same day as the accident. According to Warren, "when I arrived at the house, we went out to the garage, and I inspected [defendant's] vehicle." Warren testified that defendant's windshield was "spider-cracked all the way across," the roof was dented, and the

front bumper and hood were damaged. Warren testified, "when I initially examined the vehicle, I just didn't have a clue as to what may have possibly could have [sic] happened." According to Warren, defendant left town a few days later on a month-long trip to visit family.

Linda Magyar was employed at Elder Ford, a Ford dealership in Troy, Michigan, in the summer of 2014. Magyar testified that, around a month after the collision, on July 31, 2014, she received a telephone call from defendant inquiring about repairs to his Ford Focus. According to Magyar, defendant indicated that his vehicle had damage to the hood and windshield, and repeatedly asked how quickly the dealership could fix his vehicle. Magyar testified that she arranged a tow truck to tow defendant's vehicle to the Elder Ford dealership.

Dennis Hertz, a tow truck driver, testified that, when he arrived at defendant's home, he observed the car in defendant's garage and noted damage to the vehicle's front bumper, hood, windshield, roof, and passenger side mirror. Hertz testified that he loaded defendant's vehicle onto the tow truck and drove it back to Elder Ford. According to Hertz, defendant rode to the dealership in the tow truck, and defendant "appeared to be a little nervous." Hertz testified that he asked defendant how his vehicle sustained the damage and defendant stated that he hit "a semi . . . in the neighborhood." Hertz testified that he believed defendant's story seemed "fishy" or "not right," so he asked Magyar to take a look at the vehicle when he and defendant arrived at the dealership.

Magyar testified that, at Hertz's request, she examined defendant's vehicle when it arrived at the dealership and observed what she believed was blood inside the passenger side door and "red fiber stuck in the windshield." Magyar testified that she believed that the damage was inconsistent with what defendant claimed had happened, and she reported the "suspicious vehicle" to her manager. Magyar testified that she also called the Royal Oak Police Department to report her suspicions.

Michael Stoijadinov, the service manager at Elder Ford, testified that he saw defendant's Ford Focus when it arrived at the dealership, and it "triggered [his] memory" of an email flier he received regarding a silver Ford Focus that was "involved in a hit and run" accident. Detective Thomas and Detective Ron Tuski responded to Elder Ford and inspected defendant's vehicle. Detective Thomas testified that the Ford Focus "was missing the right front part of the grill, the triangular part of the grill, and the passenger side mirror . . . and the vehicle at Elder Ford had windshield damage," which matched the description of the missing vehicle from the June 28, 2014 collision. Defendant's vehicle was wrapped in plastic film and towed to the police station.

Detective Thomas testified that, after the vehicle was towed to the police station, he and Detective Tuski went to defendant's residence for an interview. According to Detective Thomas, defendant reported that he "may have hit a pole," a bridge, or "somethin' parked" on the highway. Defendant stated that "the front seat had glass all over it" after the accident. After the interview, the detectives arrested defendant.

On August 2, 2014, Officers Brian Eftink and Michelle Hesse processed defendant's vehicle. Officer Eftink inspected the vehicle and noticed red fibers stuck on the windshield, and a "reddish-colored" substance that he suspected was blood on the windshield and along the roof line. Officer Eftink also observed "suspected blood" on the vehicle's front bumper. Officers

Eftink and Hesse collected the fibers and took DNA and blood swabs from around the vehicle. Officer Eftink testified that the triangular piece of plastic found at the scene of the collision appeared to fit into the broken grill on defendant's vehicle. According to Detective Thomas, "[e]very piece of property that we had in evidence from the parts that were left at the scene were missing from [defendant's] car."

Alison Riviera-Papillo, a forensic scientist at the Michigan State Police Crime Laboratory, confirmed that the substance collected from defendant's vehicle's windshield, passenger interior door, and window was the victim's blood.

Defendant was convicted and sentenced as set forth above. This appeal ensued.

## II. ANALYSIS

Defendant argues that the trial court erroneously admitted a transcript of his police interview into evidence. Decisions about the admissibility of evidence are within the trial court's discretion and should only be reversed where there is a clear abuse of discretion. *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998). A trial court abuses its discretion when it admits evidence that is inadmissible as a matter of law. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014).

Under Michigan law, the use of transcripts at trial is similar to the use of photographs, maps, drawings, and mechanical models. *People v Karalla*, 35 Mich App 541, 546; 192 NW2d 676 (1971). A written transcript may be admitted even when the original recording from which the transcript is made is also entered into evidence. *Id*. There are three "preferred procedures for ensuring the accuracy and fairness" of transcripts used by the jury to "read along while they listen" to a recording. *People v Lester*, 172 Mich App 769, 772; 432 NW2d 433 (1988). First, the parties may stipulate to the accuracy of the transcripts. *Id*. Second, the trial court may "make an independent determination before trial by checking the transcripts against the tape." *Id*. Third, the jury may be presented "with two transcripts, one containing the state's version and the other defendant's." *Id.*

At trial, the prosecutor offered both an audio recording of the interview and a transcript into evidence. Defense counsel objected to the transcript because it was created by the prosecutor and was uncertified. The record shows that the parties did not stipulate to the accuracy of the transcripts, the transcriptionist who created the transcript did not testify, and the transcript was not certified. However, the trial court verified the accuracy of the transcript when it questioned a detective who participated in the interview. The detective testified that he reviewed the audio recording and the transcript and affirmed that the transcript was fair and accurate. Moreover, the jury had the chance to independently verify the transcript's accuracy by comparing their copies of the transcript to the audio recording, which was played aloud in court. Further, defendant does not point to any specific errors in the transcript. Given that the trial court verified the transcript's accuracy by questioning the interviewing officer, that the jurors had an independent opportunity to compare the transcript and the recording, and that record does not reflect any inaccuracy in the transcript, the trial court did not abuse its discretion in admitting it into evidence. *Starr*, 457 Mich at 494. Moreover, given the overwhelming evidence

introduced at trial, defendant cannot show that admission of the transcript amounted to more than harmless error. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

Next, defendant argues that the trial court relied on facts not found by the jury or admitted by defendant when scoring his OVs under the sentencing guidelines, contrary to *Lockridge*, 498 Mich at 358. In *Lockridge*, our Supreme Court extended the rule of *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), to Michigan's mandatory minimum sentencing guidelines and concluded that Michigan's sentencing scheme violated the Sixth Amendment right to a jury trial. According to *Lockridge*, Michigan's sentencing scheme was constitutionally deficient to the extent "to which the guidelines require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that mandatorily increase the floor of the guidelines minimum sentence range." *Id.* at 364. To remedy the deficiency, the Court held that the guidelines are advisory only. *Id.* at 399.

Under *Lockridge*, "all defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry." *Lockridge*, 498 Mich at 395. "To make a threshold showing of plain error that could require resentencing, a defendant must demonstrate that his or her OV level was calculated using facts beyond those found by the jury or admitted by the defendant and that a corresponding reduction in the defendant's OV score to account for the error would change the applicable guidelines minimum sentence range." *Lockridge*, 498 Mich at 399.

The trial court's scoring of OVs 5 and 17 were based on facts not found by the jury or admitted by defendant. Accordingly, because those facts established the guidelines' minimum sentencing range, "an uconstitutional constraint [on the judge's discretion] actually impaired the defendant's Sixth Amendment right," *id.* at 395, and defendant is entitled to remand for a *Crosby* hearing. The *Lockridge* Court provided the following guidance for Michigan circuit courts on *Crosby* remands:

> Thus, in accordance with [*Crosby's* ] analysis, in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, *the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error.* If the trial court determines that the answer to that question is yes, the court shall order resentencing. [*Id.* at 397 (emphasis added).]

With respect to the specific procedure on a *Crosby* remand, this Court has explained as follows:

> [O]n a *Crosby* remand, a trial court should first allow a defendant an opportunity to inform the court that he or she will not seek resentencing. If notification is not received in a timely manner, the court (1) should obtain the views of counsel in some form, (2) may but is not required to hold a hearing on the matter, and (3) need not have the defendant present when it decides whether to resentence the defendant, but (4) must have the defendant present, as required by [MCR 6.425],

if it decides to resentence the defendant. Further, in determining whether the court would have imposed a materially different sentence but for the unconstitutional constraint, the court should consider only the circumstances existing at the time of the original sentence. [*People v Stokes*, 312 Mich App 181, 198; 877 NW2d 752 (2015) (quotation marks and citations omitted).]

In sum, because defendant's sentence was imposed in violation of the Sixth Amendment, we remand to the trial court for a *Crosby* hearing.

We affirm defendant's conviction and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Cynthia Diane Stephens