# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GERRAN DASHAWN MCLAURIN,

Defendant-Appellant.

UNPUBLISHED
July 7, 2016

No. 325780
Wayne Circuit Court
LC No. 14-008140-FC

Before: GADOLA, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of carjacking, MCL 750.529a; possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; assault with intent to do great bodily harm less than murder, MCL 750.84; and third-degree fleeing or eluding a police officer, MCL 257.602a(3)(a). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 26 to 40 years for the carjacking conviction, 5 to 20 years for the assault conviction, 2 to 10 years for the fleeing or eluding conviction, and a consecutive two-year term of imprisonment for the felony-firearm conviction. We affirm defendant's convictions, but remand for further inquiry of defendant's sentences in accordance with this opinion.

## I. SUBSTITUTION OF COUNSEL

Defendant first argues that the trial court erred in denying his second motion for appointment of substitute defense counsel. We disagree. "A trial court's decision regarding substitution of counsel will not be disturbed absent an abuse of discretion." *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001).

With respect to the substitution of an indigent defendant's appointed counsel, this Court has explained:

> An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced. Appointment of a substitute counsel is warranted only upon a showing of good cause and where substitution will not unreasonably disrupt the judicial process. Good cause exists where a legitimate difference of opinion develops between a defendant and his appointed

-1-

counsel with regard to a fundamental trial tactic. [*Id.* (citation and quotation marks omitted).]

"A defendant may not purposely break down the attorney-client relationship by refusing to cooperate with his assigned attorney and then argue that there is good cause for a substitution of counsel." *Id*. (citation and quotation marks omitted). "Further, [a] defendant's mere allegation that he lacked confidence in his trial counsel is not good cause to substitute counsel." *Id*. at 463. "When a defendant asserts that the defendant's assigned attorney is not adequate or diligent, or is disinterested, the trial court should hear the defendant's claim and, if there is a factual dispute, take testimony and state its findings and conclusion on the record." *People v Bauder*, 269 Mich App 174, 193; 712 NW2d 506 (2005), overruled in part on other grounds in *People v Burns*, 494 Mich 104, 112-113; 832 NW2d 738 (2013).

The trial court previously appointed substitute defense counsel in October 2014. At a final pretrial conference on Friday, December 5, 2014, three days before trial was scheduled to begin, defendant's second appointed counsel informed the trial court of his belief that defendant lacked confidence in him, in part because of counsel's inability to arrange a plea offer that was acceptable to defendant. Defendant stated:

> I asked him and my last attorney numerous times to fill out motions for me that . . . haven't got [sic] done. And I asked them things about my case that they haven't or couldn't tell me about . . . .
>
> Neither one of them feels like they can fight for my life. This is my life on the line and I feel that they [are] not fighting for me. And I need somebody that . . . I feel like they can fight for my life like it's theirs on the line.

The trial court denied the motion for substitute counsel, stating:

> I would indicate . . . that this is your second request for an attorney. There is in the court file a written request that you gave me sometime ago during the pendency of this case before this Court in which you indicated that your prior counsel . . . did not have, in your words, the heart in representing you in your case.
>
> You indicated that she was not taking your case seriously, that she was not working with you and that she was working against you. That's a letter that you had written to me sometime ago during this case.
>
> Based on that representation, you were brought before the Court. I heard your arguments, which were consistent with your letter and very similar to what I've just heard today. And although probably not required, I gave you the benefit of the doubt and I appointed you new counsel—Mr. Brown, very experienced attorney here before this Court. And . . . when I did that, I told you that it was likely to be the only appointment I would make, and that this was not going to be a revolving door of attorneys requested by you. And I believe you agreed on the record.

Having said that, we were here earlier this week at which time, . . . this issue was addressed with regard to what the plea offer was or was not and there was some dispute about or some misunderstanding about what the offer was. And I specifically recall you indicating is there a way we can push this back, meaning is there a way we can push this trial back. And I believe either your counsel or myself said no that's not gonna happen.

It's interesting that only a couple days after that and you have not gotten a more favorable offer here, that . . . now . . . there has been in the last couple days a breakdown sufficient that you're asking for a new attorney. . . . [S]o just factually I think that that needs to be clear.

And the only thing I've heard in terms of the basis for that is essentially the same argument that you had made about your prior counsel; that essentially you don't think that the attorney has your best interest at mind, in heart because they're doing what any good attorney would do is trying to get you the most options available to you.

Certainly you have the right to a trial, which I'm sure you're going to be exercising, but the alternative is to make sure that you have an informed decision made. And the way you get an informed decision is finding out the pros and cons of going to trial, which Mr. Brown has provided to you, and then compare that with the best offer you can get from the prosecution, which Mr. Brown has worked hard to obtain, including speaking to the prosecution's supervisor.

\* \* \*

. . . Here, I've heard argument that simply you don't think Mr. Brown has your best interests at . . . heart, because he's tried to get you the best possible plea offer available.

Now it's your decision whether to accept the plea or not, but Mr. Brown, like any good attorney, is gonna try to give you the best options . . . . And he's worked hard to give you those options, but apparently . . . you think he does not have your best interest at heart because he must think you're guilty because he's trying to get you a good deal from the prosecution . . . .

The record amply supports the trial court's conclusion that defendant failed to demonstrate good cause for a second substitution of trial counsel. Defendant made only general complaints that defense counsel was unprepared for trial and failed to communicate with defendant. *Traylor*, 245 Mich App at 462-463. Defendant offered nothing to substantiate that he and defense counsel had a legitimate difference of opinion regarding any specific fundamental trial tactic, or that defense counsel otherwise performed inadequately, lacked in diligence, or exhibited disinterest in his case. *People v Mack*, 190 Mich App 7, 14; 475 NW2d 830 (1991); *People v Meyers (On Remand)*, 124 Mich App 148, 166; 335 NW2d 189 (1983).

The record also amply supports the trial court's implicit conclusion that defendant's second substitution of counsel, only three days before trial, would unreasonably disrupt the

judicial process. *Traylor*, 245 Mich App at 462. As the trial court found, defendant made some of the same arguments in support of his motion to substitute his first defense counsel, and defendant also had recently mentioned a trial adjournment.

Accordingly, the trial court did not abuse its discretion in denying defendant's second request for substitute counsel.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant next argues that defense counsel was ineffective for failing to call an expert witness to challenge the reliability of the eyewitness identification testimony. "Because a *Ginther*[1] hearing was not conducted, [the Court's] review of the relevant facts is limited to mistakes apparent on the existing record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003). The existing record includes defendant's motion for a new trial, in which he maintained that trial counsel should have presented expert testimony concerning eyewitness identification.

Whether a defendant has received the effective assistance of counsel comprises a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A judge finds the facts and then decides whether those facts amount to a violation of the defendant's constitutional right to the assistance of counsel. *Id*. "[T]he right to counsel is the right to the effective assistance of counsel." *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984) (citation omitted). In *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984), the United States Supreme Court held that a convicted defendant's claim of ineffective assistance of counsel includes two components: "First, the defendant must show that counsel's performance was deficient . . . . Second, the defendant must show that the deficient performance prejudiced the defense." To establish the first component, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). With respect to the prejudice aspect of the test for ineffective assistance, the defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed. *Id*. at 663-664. The defendant must overcome the strong presumptions that "counsel's conduct falls within the wide range of professional assistance," and counsel's actions represented sound trial strategy. *Strickland*, 466 US at 689. This Court may not "substitute [its] judgment for that of counsel on matters of trial strategy, nor will [it] use the benefit of hindsight when assessing counsel's competence." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009) (citation and quotation marks omitted).

In *People v Cooper*, 236 Mich App 643, 658; 601 NW2d 409 (1999), this Court rejected a defendant's contention that defense counsel was ineffective for neglecting to call as a defense witness an eyewitness identification expert, explaining:

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Defendant also argues that trial counsel provided ineffective assistance by failing to present expert psychological testimony about how the circumstances of the incident could have impaired McGinnis' perception, memory, and ability to recognize the shooter. Trial counsel's conduct in this regard is presumed to be a permissible exercise of trial strategy. Defendant has not overcome that presumption. Throughout his cross-examination of McGinnis, trial counsel elicited apparent discrepancies and arguable bases for regarding McGinnis' identification of defendant as the shooter to be suspect. Trial counsel may reasonably have been concerned that the jury would react negatively to perhaps lengthy expert testimony that it may have regarded as only stating the obvious: memories and perceptions are sometimes inaccurate.

In the present matter, the trial court denied defendant's motion for a new trial based upon trial counsel's failure to call an eyewitness identification expert, stating:

Defendant fails to show how his counsel's failure to call an expert witness to testify about the fallibility of eyewitness identification and testimony would have resulted in a different outcome at trial. There were two witnesses who identified the defendant as the person who shot and carjacked the complaining witness in this case. The defendant was found shortly after the carjacking driving the complainant's car and was involved in a high-speed chase with the police.

The eyewitness' testimony was in support of the fact that they saw the defendant in broad daylight carjack the complaining witness. Further, they testified that they identified him as I mentioned at a lineup.

Defendant fails to cite any legal authority that would require a trial attorney to call an expert witness. Therefore, for all of these reasons I am finding that the defendant fails to demonstrate that the potential testimony of an expert eyewitness evaluator would have changed the outcome in this trial. Therefore, he fails to demonstrate prejudice . . . .

Defense counsel began his cross-examination of the first eyewitness to testify, Cheryl Harrison, by questioning her in a prolonged manner regarding her knowledge of the direction the assailant had driven the victim's SUV out of the store parking lot, and the direction the victim had laid in the parking lot. Defense counsel also questioned Harrison about other topics in a manner that "elicited apparent discrepancies and arguable bases for regarding [her eyewitness] identification of defendant as the shooter to be suspect," *Cooper*, 236 Mich App at 658, including: (1) where another eyewitness, Mark Saunders, parked in the store parking lot; (2) her estimation of the distance between her parking spot and the victim's SUV; (3) her position inside Saunders's truck when she first heard a loud argument; (4) the order of things she heard and saw near the victim's car; (5) her trial identification of defendant on the basis of his eyes, face, and hair; (6) her statement to the police on August 20, 2014, describing the assailant as a light-complected African-American man between 25 and 30 years of age, approximately 5'6" tall, weighing between 155 and 165 pounds, wearing an orange T-shirt and tan pants, and holding a silver handgun; (7) her failure to mention to the police on August 20, 2014, anything about the assailant's beady eyes, or the assailant wearing anything on his head; (8) her decision to continue

-5-

walking toward the dispute after allegedly seeing the assailant holding a gun; (9) whether she had seen defendant immediately before the August 21, 2014 lineup; (10) whether police officers had suggested defendant might be in the lineup; (11) on August 21, 2014, she made another statement to the police describing the assailant as between 20 and 25 years of age, having a medium build and an unkempt beard or goatee, wearing an orange or red T-shirt and light-colored pants, and holding a small-caliber silver handgun; (12) whether she and Saunders had discussed the assailant's August 20, 2014 appearance and their recollections of the events that day; (13) her inability at trial to recall the manner in which the assailant wore his hair on August 20, 2014; and (14) on August 20, 2014, she had felt more focused on the handgun than the assailant's facial features and clothing.

Defense counsel similarly cross-examined the victim concerning: (1) his inability to identify defendant in a lineup; (2) the location where he parked his SUV on August 20, 2014; (3) that he did not see every moment of the assailant's assault because he had periodically turned his back toward the assailant; (4) the victim feared for his personal safety; and (5) the victim testified that his assailant had very piercing eyes, but during the victim's statements to the police, he did not mention the assailant's eyes.

Defense counsel also questioned Saunders, including with respect to: (1) Saunders's belief that before he and Harrison got out of his truck, the nearby gunshot had occurred; (2) Saunders did not approach the victim until the assailant had driven away the victim's SUV; (3) in Saunders's statement to the police, he described the assailant as having a light complexion, wearing a hat or hood, dark pants, and holding a black automatic handgun; (4) Saunders did not remember the assailant having facial hair; and (5) Saunders's estimation of the precise locations of his truck and the victim's SUV in the parking lot, and the distances from which he made his observations on August 20, 2014.

Defense counsel cross-examined the officer who arrested defendant, Kevin Briggs, including with respect to: (1) Briggs's estimation that by the time he turned his police car around to pursue defendant on Burns Avenue, the SUV "had [more than] a . . . quarter mile lead on" Burns; (2) during the pursuit, darkness had started to descend; (3) the vehicle headlights allowed Briggs to see defendant driving the SUV when it passed Briggs on Burns Avenue; (4) when passing the SUV, Briggs also saw a dark-complected African-American in the front passenger seat; (5) Briggs described his first sighting of defendant as revealing a light-complected African-American man in his early 20's, who wore a moustache; (6) Briggs did not remember seeing defendant wearing a hat or a hood; (7) on first seeing the SUV after it crashed, Briggs walked in front of the SUV and saw more than one person trying to get out of it; (8) after the crash, Briggs saw that the passenger had gotten out and was arrested by another officer, and defendant "ran out of the side passenger door and took off running on foot"; (9) defendant wore a red T-shirt and black pants, stood approximately 5'10", and reported his own weight as 167 pounds; and (10) Briggs did not locate any physical evidence connecting defendant to the carjacking.

Defense counsel also cross-examined the police officer in charge of the investigation, Earl Monroe, including regarding: (1) Monroe's inability to identify defendant or discern a shooting in a surveillance video; (2) Monroe had not received any physical evidence connecting defendant to the carjacking, including fingerprints, a handgun, or ammunition; (3) although

Harrison described the assailant's handgun as silver, the victim and Saunders described it as black; (4) Monroe gave defendant a white T-shirt to wear during the August 21, 2014 lineup, instead of his red T-shirt; and (5) Monroe did not document in a report his discussion with the victim after his viewing of a lineup, when the victim had mentioned that he had not gotten a good view of defendant's eyes during the lineup, but the victim thought defendant had been in the lineup.

The record thus reveals that defense counsel thoroughly cross-examined all of the prosecutor's witnesses. Furthermore, defense counsel's objection convinced the trial court to refuse to admit a cell phone that the police recovered inside the victim's SUV, which allegedly contained photographs of defendant. Defense counsel also called a police officer, who first saw a person he suspected was defendant at night, from a block away, and through binoculars, but the officer did not see defendant get out of the victim's SUV after it crashed. During closing argument, defense counsel consistently and vigorously presented the defense theory that defendant was misidentified as a participant in the carjacking. Defense counsel argued that the witnesses had mistakenly identified defendant, in light of the absence of surveillance video depicting defendant and the victim, the police failure to locate any fingerprints, ammunition, or a handgun tying defendant to the charges, and the differences in the witnesses' vantage points of the event, and different descriptions of defendant and the charged events. And, defense counsel alternatively argued that if the jury believed defendant was the victim's assailant, defendant did not intend to kill the victim. We conclude that defense counsel chose a reasonable trial strategy in cross-examining the prosecutor's witnesses to cast doubt on their identifications of defendant, instead of resorting to an expert identification witness. *Strickland*, 466 US at 689; *Cooper*, 236 Mich App at 658.

Even assuming that defense counsel could be considered ineffective for not calling an eyewitness identification expert, we conclude that defendant did not endure any prejudice. *Solmonson*, 261 Mich App at 663-664. In light of defense counsel's diligent efforts to cast doubt on the identifications by the prosecutor's witnesses, we cannot conclude that the lack of an eyewitness identification expert deprived defendant of a substantial defense. *People v Marshall*, 298 Mich App 607, 612; 830 NW2d 414 (2012) (describing a substantial defense as one "that might have made a difference in the outcome of the trial"), vacated in part on other grounds 493 Mich 1020 (2013).

III. SCORING OF OFFENSE VARIABLES 4 AND 9

Defendant argues that resentencing is required because the evidence did not support the trial court's assessment of 10 points each for offense variables 4 and 9. We disagree.

In *People v Steanhouse*, 313 Mich App 1, 18; ___ NW2d ___ (2015), lv gtd __Mich__ (docket no. 152671) (May 25, 2016), this Court set forth the following standards for review of scoring decisions:

> The circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the

application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [Citation and quotation marks omitted.]

MCL 777.34(1)(a) authorizes a court to assess 10 points for OV 4 if "[s]erious psychological injury requiring professional treatment occurred to a victim." This Court has "upheld a trial court's assessment of 10 points for OV 4 where the victim suffered personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *People v Schrauben*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 323170); slip op at 7.

The trial court explained that OV 4 was properly scored at 10 points in this matter, stating:

> Here, the Court had the benefit of presiding over the trial at which time the complaining witness testified that after the defendant threatened him and demanded his keys, and the complainant did not immediately comply, the defendant shot the complainant in the leg. While on the ground, the complainant threw the keys at the defendant. The defendant continued to stand over the complainant wagging his gun in the complainant's face.

> Complainant further testified that he begged that the defendant not shoot him again and believed that he was going to be shot and killed. He rolled over, covered his head and face preparing to be shot again. He, according to his testimony, thought he was going to die.

> Although maybe not readily apparent from the transcript, this Court also observed the demeanor and behavior of the complainant while testifying. He was emotional both . . . during his testimony as well as sentencing. And for all of these reasons, I do believe that the Court properly scored Offense Variable 4 as 10 points for psychological injury requiring professional treatment to the victim.

The victim testified that defendant had pulled on his shirt from behind, the victim turned to face defendant, and defendant placed a gun against the victim's chest. Defendant threatened, "This is a real gun," "This is a carjacking," and "[G]ive me the keys." The victim also testified that he had tried pushing defendant's gun away from him, while saying, "Get this gun away from me. Don't kill me. Don't shoot me." The victim turned his body into defendant, continued struggling, and felt a gunshot, which the victim likened to a hammer striking his leg. The victim then faced defendant, and announced, "You shot me," "Don't do it again. Don't shoot me. Don't shoot me." The victim remembered that defendant had pointed the gun at his face, which prompted the victim to give defendant the SUV keys. The victim also recalled that he fell backward onto the ground, defendant stood over him, defendant pointed the gun at his head, the victim rolled onto his side and covered his face, and the victim "lost it" because he thought defendant would shoot him again. At the sentencing hearing, the victim added that he and many residents of Detroit had experienced carjacking, which the victim described as "a type of urban terrorism that can reach out and grab them at any time," and caused them to "liv[e] in constant fear." In light of the victim's testimony that defendant placed him in fear for his life and the victim's statement at sentencing about living in constant fear, the trial court did not clearly err in

finding that the victim suffered a serious psychological injury requiring professional treatment. Therefore, the trial court did not err in assessing 10 points for OV 4.

MCL 777.39(1)(c) authorizes a court to assess 10 points for OV 9 if "[t]here were 2 to 9 victims who were placed in danger of physical injury or death." A sentencing court may score OV 9 "only on the basis of the defendant's conduct during the sentencing offense," and may not "consider conduct after an offense has been completed." *People v Gratsch*, 299 Mich App 604, 623; 831 NW2d 462 (2013) (citation and quotation marks omitted), vacated in part on other grounds 495 Mich 876 (2013).

In MCL 750.529a(1), the Legislature defined one who is guilty of the felony of carjacking as follows:

> A person who in the course of committing a larceny of a motor vehicle uses force or violence or the threat of force or violence, or who puts in fear any operator, passenger, or person in lawful possession of the motor vehicle, or any person lawfully attempting to recover the motor vehicle.

The phrase "in the course of committing a larceny of a motor vehicle" includes "acts that occur in an attempt to commit the larceny, or during the commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the motor vehicle." MCL 750.529a(2). At sentencing, the trial court explained its decision to assess 10 points for OV 9 as follows:

> I am gonna score 10 points for OV 9 for the following reasons. The Court heard testimony from two civilian witnesses who were exiting the vehicle at the time of this . . . confrontation.
>
> At the time that this took place, it was in broad daylight in a public parking lot with people coming and going, including the two civilian witnesses who were getting out of the car during this confrontation. The defendant discharged his firearm in a public parking lot with people around, not just placing the complaining witness['s] . . . life in jeopardy, but also any other civilian who was nearby, including the two civilian witnesses who were only a matter of feet away.

After defendant filed a postsentencing motion again challenging the scoring of OV 9, the trial court further explained why it believed that 10 points were properly scored for OV 9:

> I do find that Offense Variable 9 was properly scored as 10 points for two reasons. First, I do find that discharging a firearm in a parking lot open to the public in the middle of the day into someone's body who is lying on the ground creates a substantial danger to anyone else at least in that same parking lot. Here, we do have the two witnesses, at the very least, who were in the parking lot at the time; not to mention brandishing that same firearm at the complainant in a parking lot off . . . Jefferson, middle of the day certainly created a substantial risk to anyone within that same parking lot at least . . . .

Further, I do and am now considering the conduct of the defendant leaving the scene of the carjacking parking lot. Having been on a public road at a high rate of speed, jumping a curb onto . . . Jefferson, one of the busiest streets in the City of Detroit, in the middle of the day without any regard to the people either within the parking lot or people into . . . Jefferson, I do find that that also exposed people within the parking lot and on . . . Jefferson to a substantial risk of or danger of physical injury . . . .

In light of the evidence that defendant placed at risk of physical injury or death the victim, witnesses Harrison, and Saunders, who were in reasonably close proximity in the parking lot when defendant shot the victim, and the evidence reasonably establishing at trial that placed at least one pursuing police officer in danger of personal injury during his flight from the carjacking scene, we conclude that the trial court correctly scored OV 9 at 10 points. See *People v Mann*, 287 Mich App 283, 286-288; 786 NW2d 876 (2010) (holding that in light of the statutory definition of armed robbery as encompassing conduct that occurs in the course of committing the robbery, including "flight or attempted flight after the completion of the larceny," (MCL 750.530, MCL 750.529) the trial court properly scored 10 points for OV 9 on the basis of the defendant's commission of a second crime in flight from an armed robbery).

## IV. JUDICIAL FACT-FINDING AT SENTENCING

Defendant further challenges his sentence as violative of his right to a jury trial. Defendant preserved this issue by arguing in his postsentencing motion that judicial fact-finding at sentencing violated his right to a jury trial. *People v Terrell*, 312 Mich App 450, 455; ___ NW2d ___ (2015). "A Sixth Amendment challenge presents a question of constitutional law that this Court reviews de novo." *People v Lockridge*, 498 Mich 358, 373; 870 NW2d 502 (2015).

In *Lockridge*, 498 Mich at 364, our Supreme Court held that "the rule from *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), applies to Michigan's sentencing guidelines and renders them constitutionally deficient," in violation of the Sixth Amendment, to the extent that they "*require* judicial fact-finding beyond facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range . . . ." To remedy this violation, the Court severed MCL 769.34(2) to the extent that it makes a sentencing guidelines range based on judge-found facts mandatory, and held that a guidelines range calculated in violation of *Apprendi* and *Alleyne* is advisory only. *Lockridge*, 498 Mich at 364-365.

The *Lockridge* Court explained that where facts admitted by the defendant or found by the jury are insufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he was sentenced, an unconstitutional constraint will have actually impaired the defendant's Sixth Amendment right. *Id.* at 395. The Court further held that "in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error." *Id.* at 397.

This remand procedure was modeled on the procedure adopted in *United States v Crosby*, 397 F3d 103 (CA 2, 2005). *Lockridge*, 498 Mich at 395-396.

In *People v Stokes*, 312 Mich App 181, 197-198; 877 NW2d 752 (2015), lv pending, this Court observed that whereas *Lockridge* involved an unpreserved error subject to review for plain error affecting substantial rights, the defendant in *Stokes*, like defendant in this case, had preserved his claim of error under *Alleyne*. This Court held that a preserved *Alleyne/Lockridge* error must be reviewed to determine if it qualifies as harmless beyond a reasonable doubt. *Stokes*, 312 Mich App at 198-199; *Terrell*, 312 Mich App at 455. This Court further held that "in order to determine whether the error . . . was harmless, the *Crosby* remand procedure [adopted in *Lockridge*] must be followed." *Stokes*, 312 Mich App at 198-199.

The parties do not dispute that carjacking qualifies as a class A offense, MCL 777.16y, subject to the sentencing grid that appears in MCL 777.62. The parties also do not dispute that in sentencing defendant, the trial court scored a total of 90 OV points, placing defendant in OV Level V (80 – 99 points), and that defendant received a prior record variable (PRV) score of 60 points. The parties agree that in ruling on defendant's postsentencing motion, the trial court correctly subtracted 10 points that it had improperly scored for OV 10, reducing defendant's total OV score to 80 points, but not requiring resentencing because defendant still occupied OV level V. And, the parties agree that the trial court enhanced defendant's sentence as a fourth-offense habitual offender, which increased his guidelines range to 171 to 570 months. MCL 777.21(3)(c); MCL 777.62.

Defendant argues, and the prosecutor concedes, that the trial court's scoring of OVs 1, 3, 4, 9, and 13 required judicial fact-finding, and thereby increased defendant's guidelines range from 108 to 360 months to 171 to 570 months as a fourth-offense habitual offender. Because judicial fact-finding increased defendant's minimum sentence range, defendant has demonstrated that an unconstitutional constraint actually impaired his Sixth Amendment right. *Lockridge*, 498 Mich at 395. Therefore, we remand for further inquiry of defendant's sentences in accordance with the procedure set forth in *Lockridge*, *id*. at 396-399. On remand, defendant must be given the option of promptly notifying the trial judge that resentencing will not be sought. If notification is not received in a timely manner, the trial court shall continue with the proceeding. If the trial court determines that it would have imposed the same sentence absent the unconstitutional constraint on its discretion, it may reaffirm the original sentence. If, however, the trial court determines that it would not have imposed the same sentence absent the unconstitutional constraint on its discretion, it shall resentence defendant. *Id.*

## V. STANDARD 4 BRIEF[2]

Lastly, in a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, defendant argues that his out-of-court identifications by Harrison and Saunders were tainted by unduly suggestive pretrial identification procedures, and that defense counsel was ineffective for failing to seek a pretrial hearing to determine the

---

[2] Michigan Supreme Court, Administrative Order, 2004-6, Standard 4

constitutionality of the identifications. Defendant did not challenge the witnesses' identification in the trial court, leaving this issue unpreserved and subject to review for plain error affecting his substantial rights. *People v King*, 297 Mich App 465, 472-473; 824 NW2d 258 (2012). Similarly, review of defendant's ineffective assistance of counsel claim is limited to mistakes apparent from the record. *Riley (After Remand)*, 468 Mich at 139.

To challenge an in-court identification "on the basis of lack of due process, a defendant must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Williams*, 244 Mich App 533, 542; 624 NW2d 575 (2001) (citation and quotation marks omitted).

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [*People v Kurylczyk*, 443 Mich 289, 306; 505 NW2d 528 (1993) (citation and quotation marks omitted).]

"If the trial court finds that the pretrial procedure was impermissibly suggestive, evidence concerning the identification is inadmissible at trial . . . [unless] an independent basis for in-court identification can be established" that qualifies as "untainted by the suggestive pretrial procedure." *Id*. at 303 (citation and quotation marks omitted).

The record does not disclose any evidence suggesting that Harrison's or Saunders's trial identifications of defendant arose from an unduly suggestive pretrial identification procedure. Harrison and Saunders testified that in daylight on August 20, 2014, they saw defendant in the same store parking lot where Saunders had just parked with Harrison inside his truck. The attention of Harrison and Saunders was drawn to an SUV parked approximately 20 feet away in the same lot, where they heard the sounds of a struggle and yelling. Harrison testified that she had approached the SUV, had seen the victim and defendant wrestling, and heard defendant threaten to shoot the victim if he did not give defendant his SUV keys. Saunders explained that he saw defendant through the back window of his truck, but had an unimpeded view. Harrison and Saunders similarly described defendant's basic appearance: a young African-American man, between 20 and 30 years of age, with a medium build, and who possessed a handgun during the assault. They differed with respect to whether defendant had worn a hat or hood, an orange or a red T-shirt, black or brown pants, or had any facial hair, but those discrepancies affect only the weight of their identification testimony, not its admissibility. *People v Davis*, 241 Mich App 697, 705; 617 NW2d 381 (2000). The lineup attended by Harrison and Saunders occurred one day after the crime. The testimonies of Harrison, Monroe, and Saunders reflected that they identified defendant promptly and with certainty.

The only evidence that defendant cites purportedly casting doubt on the identifications by Harrison and Saunders consists of his own December 9, 2015 affidavit. In the affidavit, defendant maintains:

-12-

2. That I informed trial counsel Mark Brown that on 8/21/14, at Detroit Detention Center (Mound), witness Cheryl Harrison was brought to the bullpen by Detroit Police Officer Lawrence Mitchel, and pointed me . . . out, stating that I was perpetrator of said crimes.

This attestation contradicts the evidence at trial. Harrison, Monroe, and Saunders agreed that Officer Lawrence Mitchel only escorted Harrison and Saunders to and from the lineup room. Harrison, Monroe, and Saunders likewise agreed that no one had prompted Harrison's and Saunders's identifications of defendant. And Monroe testified that the lineup participants could not see the other people in the lineup room.

We also note that defendant offers no factual substantiation for his argument that an attorney present at the lineup "was functioning as defendant's counsel, or the prosecutor," or that a reasonable possibility exists that "defendant's constitutional rights were not protected." *Payne*, 285 Mich App at 195 (declining to consider a factually unsupported appellate argument). The testimony of Harrison, Saunders, and Monroe established that the lineup attorney attended the lineups only to protect defendant's rights. No evidence indicated that the attorney failed to protect defendant's rights during the lineup. Defense counsel noted, in his closing argument, that the attorney was a former prosecutor.

In sum, the record does not support defendant's claim that a reasonable likelihood of suggestion existed during Harrison's and Saunder's August 21, 2014 identifications of defendant. Because no likelihood of misidentification existed, defense counsel was not ineffective for failing to make a meritless objection to Harrison's and Saunders's identification testimony. *People v Mack*, 265 Mich App 122, 130; 695 NW2d 342 (2005).

We affirm defendant's convictions and remand for further inquiry of defendant's sentences in accordance with *Lockridge*. We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro

-13-