# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

RONALD ANTHONY DIMAMBRO, JR.,

Defendant-Appellant.

FOR PUBLICATION
December 6, 2016
9:05 a.m.

No. 323251
Macomb Circuit Court
LC No. 2013-004215-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

RONALD ANTHONY DIMAMBRO, JR.,

Defendant-Appellee.

No. 332319
Macomb Circuit Court
LC No. 2013-004215-FC

Before: JANSEN, P.J., and MURPHY and RIORDAN, JJ.

RIORDAN, J.

In Docket No. 323251, defendant appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.236b(2). He was sentenced to life imprisonment for his first-degree felony murder conviction and 15 to 25 years' imprisonment for his first-degree child abuse conviction, with 338 days of jail credit. While his appeal was pending, we granted his motion to remand this case for an evidentiary hearing.[1] After holding the evidentiary hearing, the trial court granted defendant's motion for a new trial.

---

[1] *People v Dimambro*, unpublished order of the Court of Appeals, entered May 22, 2015 (Docket No. 323251).

-1-

In Docket No. 332319, the prosecution appeals by leave granted[2] the trial court's order granting defendant's motion for a new trial. For the reasons stated below, we affirm the trial court's order granting defendant's motion for a new trial and remand for further proceedings.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from the death of Damien Sutton, the two-year-old child of defendant's former girlfriend, who went into a coma on August 21, 2013, and died on August 27, 2013. At the time, the child and his mother were living with defendant and his parents. In the days before August 21, 2013, the child had been injured during a series of incidents that had occurred while he was in defendant's care. Within a few days or a week before he went into the coma, he also had fallen while sitting on top of phone books which had been stacked on top of a bar stool. Defendant's parents and the child's mother provided conflicting reports as to whether the child acted normally after the bar stool incident.

On August 21, 2013, the child's mother did not notice anything unusual about the child's behavior before she left for work at approximately 3:40 p.m. After she left, defendant was alone with the child until approximately 5:00 p.m. During his interview with the police, defendant indicated that he had left the child in a Pack 'n Play for a period of time in order to answer a phone call. When defendant returned, he noticed that something seemed off about the child. Then, when defendant picked up the child, he went limp. Defendant ultimately called his father for help and then called 911.

When the police arrived, the child was unresponsive and critically ill. The child was taken to Henry Ford Hospital and then transferred to Children's Hospital, at which time he was in a coma and put on a respirator. Six days later, the child's mother decided to remove the child from his respirator because of the extent of his brain damage and because surgeries to aid the child were unsuccessful. After the child died, defendant was charged with first-degree child abuse and first-degree felony murder.

At trial, the prosecution presented testimony from Nikki Sutton, the child's mother; Lieutenant Michael Mackenzie, a paramedic who responded to the scene on August 21, 2013; Dr. Mary Lu Angelilli, a Children's Hospital of Michigan pediatrician who was familiar with this case and who was certified as an expert in the field of child abuse;[3] Deputy Bret Sypniewski, an evidence technician who collected evidence related to this case in August 2013; Jason Foltz, defendant's half-brother; Madison Foltz, defendant's niece and Foltz's daughter, who testified, *inter alia*, that she had seen defendant shake the child at issue in this case in the past; Detective Eric Ehrler, who was the officer in charge of the case and who had interviewed defendant on August 21, 2013; and Dr. Daniel Spitz, the chief medical examiner for Macomb County, who

---

[2] *People v Dimambro*, unpublished order of the Court of Appeals, entered April 15, 2016 (Docket No. 332319).

[3] Notably, Dr. Angelilli testified that the injuries in this case could be consistent with abusive head trauma.

completed the autopsy in this case. The defense presented testimony from Kit Dimambro, defendant's mother; Leslie Clarke, who was acquainted with defendant and had no knowledge concerning the facts of this case; Alison Cucchiara, defendant's friend and previous girlfriend who also had no knowledge about this case; and Dr. Bader Cassin, a medical examiner who testified as an expert witness. Defendant ultimately was convicted of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.236b(2).

After filing a claim of appeal in this Court, defendant filed a motion to remand so that he could file a motion for a new trial in the trial court and develop the factual record necessary for appellate review of his ineffective assistance of counsel claims. We granted defendant's motion to remand in May 2015, and he subsequently filed a motion for a new trial in the trial court based on the two ineffective assistance of counsel claims that he had raised in his brief on appeal.

A *Ginther*[4] hearing was scheduled for June 30, 2015. At the beginning of the hearing, one of the prosecutors stated:

> Last night I discussed the hearing with the medical examiner regarding the testimony of Dr. Dragovic, who's going to testify today, and this morning, when I got to the office, I had a disk containing 33 pictures that I don't believe we've ever seen, and I can't imagine that they would have ever seen it, given the testimony and everything I've reviewed. I can't be sure that they didn't get it, but I think it's safer to err on the side of them not getting it at this moment.

The hearing was adjourned so that the defense could have the opportunity to review the new photographs. Subsequently, we granted the parties' stipulated motion to expand the scope of the remand proceedings to include any issues related to the newly disclosed photographs.[5]

The evidentiary hearing was ultimately held on September 2, 2015, and September 15, 2015. The parties stipulated that Dr. Spitz had provided 32 photographs to the prosecution on June 29, 2015, and that the photographs had not previously been provided to the prosecution, the defense, or Dr. Cassin, the defense expert.[6] The trial court also heard testimony from Dr. Ljubisa J. Dragovic, defendant's trial counsel, Dr. Chris A. Van Ee, and Imran Syed, an attorney who contacted defense counsel prior to trial.

After the hearing, defendant filed a supplemental brief in support of his motion for a new trial. Along with his earlier arguments that he was entitled to a new trial because his trial

---

[4] *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973).

[5] *People v Dimambro*, unpublished order of the Court of Appeals, entered July 14, 2015 (Docket No. 323251).

[6] Notably, before trial, defense counsel filed a motion in which he requested "a copy of any and all supplemental reports and interviews, statements, photographs and evidence," and a motion in which he expressly requested preservation of "the autopsy photographs, medical examiners [sic] notes[,] and documents."

counsel was ineffective, he argued that the prosecution's failure to disclose the photographs to the defense was a *Brady*[7] violation and that violation also entitled him to a new trial. The prosecution disagreed, rejecting defendant's claims and arguing that defendant's motion should be denied.

In January 2016, the trial court entered an opinion and order granting defendant's motion for a new trial, concluding that defendant had demonstrated a *Brady* violation and had established that defense counsel provided ineffective assistance. The prosecution then filed a motion for reconsideration, or, in the alternative, to reopen the proofs so that the court could hear testimony from Dr. Spitz and Dr. Cassin. The trial court denied the prosecution's motion in March 2016.

On April 6, 2016, the prosecution filed an application for leave to appeal the trial court's order granting defendant's motion for a new trial and its order denying the prosecution's motion for reconsideration. We granted the prosecution's application and consolidated Docket No. 332319 with Docket No. 323251.[8]

## II. *BRADY* VIOLATION

The parties dispute whether the trial court properly determined that a *Brady* violation had occurred in this case. We agree with defendant that the trial court properly concluded that, whether inadvertent or not, (1) the prosecution suppressed the photographs for *Brady* purposes, despite the fact that the medical examiner had sole possession of them; (2) the photographs were favorable to defendant; and (3) the photographs were material in this case.[9]

## A. STANDARD OF REVIEW

A trial court's decision on a motion for new trial is reviewed for an abuse of discretion, which "occurs when the trial court renders a decision falling outside the range of principled decisions." *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). "Underlying questions of law are reviewed de novo, while a trial court's factual findings are reviewed for clear error." *People v Terrell*, 289 Mich App 553, 559; 797 NW2d 684 (2010) (citations omitted). Similarly, "[t]his Court reviews due process claims, such as allegations of a *Brady* violation, de novo." *People v Stokes*, 312 Mich App 181, 189; 877 NW2d 752 (2015). Pursuant to MCR 6.431(B), "[a] trial court may grant a new trial to a criminal defendant on the basis of any ground that

---

[7] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[8] *People v Dimambro*, unpublished order of the Court of Appeals, entered April 15, 2016 (Docket No. 332319).

[9] The prosecution emphasizes numerous purported inaccuracies in the trial court's factual findings in this matter. As explained below, the record clearly demonstrates that defendant established the factual basis of a *Brady* violation. To the extent that any of the trial court's factual findings were inaccurate, we conclude that none of them warrant reversal of its opinion and order granting defendant's motion for a new trial.

would support reversal on appeal or because it believes that the verdict has resulted in a miscarriage of justice." *Terrell*, 289 Mich App at 559 (quotation marks and citations omitted).

## B. ANALYSIS

As the Michigan Supreme Court explained in *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014), the United States Supreme Court held in *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), "that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " The essential components of a *Brady* violation are as follows: " 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Chenault*, 495 Mich at 149-150, quoting *Strickler v Greene*, 527 US 263, 281-282; 119 S Ct 1936; 144 L Ed 2d 286 (1999). "Stated differently, the components of a 'true *Brady* violation,' are that: (1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Chenault*, 495 Mich at 150.

## 1. SUPPRESSION BY THE PROSECUTION

The parties dispute whether the prosecution's expert witness, Macomb County Medical Examiner Dr. Spitz, falls within the scope of "the government," such that the prosecution's failure to learn of and disclose 32 additional autopsy photographs under the control of Dr. Spitz qualifies as a suppression of evidence.

> The government is held responsible for evidence within its control, even evidence unknown to the prosecution, *Kyles v Whitley*, 514 US 419, 437; 115 S Ct 1555; 131 L Ed 2d 490 (1995), without regard to the prosecution's good or bad faith, *United States v Agurs*, 427 US 97, 110; 96 S Ct 2392; 49 L Ed 2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). [*Chenault*, 495 Mich at 150.]

Accordingly, even though due process does not generally require the prosecution to seek and find exculpatory evidence, or search for evidence that will support a defendant's case, *People v Coy*, 258 Mich App 1, 21; 669 NW2d 831(2003), "the individual prosecutor [does have] a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including police," *Kyles*, 514 US at 437.

The prosecution argues that defendant failed to fulfill the first prong of the test because "it is absolutely undisputed that the prosecution never suppressed the additional autopsy photographs when that evidence was under the sole possession and control of the medical

examiner," who "does not fall under the prosecution's control." (Emphasis omitted.)[10]  We conclude that it is clear from the county medical examiners act, MCL 52.201 *et seq.*, that evidence under the control of a county medical examiner constitutes evidence within the control of the government for *Brady* purposes in Michigan.  Pursuant to MCL 52.202(1), "[a] county medical examiner or deputy county medical examiner *shall investigate* the cause and manner of death of an individual" in several circumstances, including if "[t]he individual dies by violence," or if "[t]he individual's death is unexpected." (Emphasis added.)  See also MCL 52.205.  Under MCL 52.212, "[a]ny and all medical examiners or their deputies may *be required to testify in behalf of the state* in any matter arising as the result of any investigation required under this act, and *shall testify in behalf of the state* and shall receive such actual and necessary expenses as the court shall allow." (Emphasis added.)  Based on these statutes, the Michigan Supreme Court concluded in *Maiden v Rozwood*, 461 Mich 109, 132; 597 NW2d 817 (1999), that a county medical examiner's "duty is owed to the state," and it noted that a medical examiner fulfills his or her statutory duty to investigate violent deaths by communicating his or her medical findings to the prosecution and testifying on behalf of the prosecution regarding the results of his or her investigation.

In sum, it is apparent that a county medical examiner is expected to work closely with the prosecution in cases related to the investigation of an unexpected or violent death and is expected to testify on the prosecution's behalf.  Notably, the United States Supreme Court does not limit the prosecution's duty to learn of favorable evidence to only the police or law enforcement agencies, but, instead, extends this duty to any "others acting on the government's behalf." *Kyles*, 514 US at 437.  Therefore, given a county's medical examiner's duty to act on the government's behalf in cases involving violent or unexpected deaths in Michigan, we conclude that (1) the medical examiner may be understood as "acting on the government's behalf" in a particular case, and (2) evidence within the medical examiner's control may be imputed to the government, even if "unknown to the prosecution." *Kyles*, 514 US at 437.

Further, the record shows that defense counsel specifically asked for all of the autopsy photographs before trial.  Notably, he filed a motion, after receiving the initial set of discovery from the prosecution, that requested "any and all supplemental" photographs and evidence, and filed another motion that expressly requested preservation of "the autopsy photographs, medical examiners [sic] notes[,] and documents."

Thus, we find that the trial court properly determined that, as defined by *Brady*, the prosecution "suppressed" evidence.

## 2. FAVORABILITY

Next, contrary to the prosecution's claims, we agree with defendant that the trial court properly concluded that the photographs were favorable to the defense.

---

[10] In support of its claim, the prosecution relies on an unpublished opinion.  Unpublished opinions are not binding on this Court, see MCR 7.215(C)(1), and we are not persuaded by the prosecution's characterization of the case.

> Evidence is favorable to the defense when it is either exculpatory or impeaching. *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]."), quoting *Napue v Illinois*, 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). [*Chenault*, 495 Mich at 150.]

The record confirms that the photographs provided a basis for impeaching the testimony of Dr. Spitz.

First, Dr. Spitz testified that he was aware that the child had undergone "a variety of medical interventions" before the autopsy was performed, but the fact that the child had undergone medical intervention did not impede his ability to determine the cause and manner of death. He testified that the child in this case sustained "blunt force trauma or blunt force injuries," and he believed, based on bruising on the exterior and interior of the scalp, that there were two separate impacts on the right side of the head, which he believed were from separate and discrete contacts. He also testified that there was bruising on the surface of the brain on the right side, which was underneath the areas of impact on the scalp, and explained that the entire brain was swollen as a result of the injury. He specifically described the bruising on the brain as "directly underlying the piece of bone that had been removed by the surgeon" and "extend[ing] into the deeper layers of the brain[.]"

His observation of bruising on the brain was a significant component of his findings, as he repeatedly mentioned it in conjunction with his opinions regarding the amount of force that would have been necessary to inflict the injuries in this case. It is apparent from his testimony that his observations of the bruising affected his ultimate conclusion that the child's injuries were a result of blunt force trauma; that his injuries were caused by a force greater than that generated by a household accident, such as a short or low-level fall; and that his injuries resulted from "non-accidental inflicted trauma," such that the child's death was a homicide.

However, Dr. Dragovic, testified, based on the additional 32 photographs, that the bruising on the surface of the cortex of the brain solely resulted from medical intervention, and that he saw no "evidence of any other bruising documented specifically on the cortex of the brain that is not related to the surgery." Additionally, he specifically confirmed that he was only able to determine that the bruises on the brain were "all the result of complications of surgical procedure" because he was given the additional 32 photographs to review. He ultimately concluded that the "major flaw" in Dr. Spitz's findings is "[t]he misrepresentation of the damage of the right-half of Damian Sutton's brain," meaning that what Dr. Dragovic saw as the consequence of the doctor's attempts, through surgical intervention, to save the child's life, Dr. Spitz saw as inflicted head trauma.[11] Stated differently, Dr. Dragovic believed, after reviewing all of the photographs as well as the other evidence provided by the defense, that the medical evidence in this case does not support Dr. Spitz's conclusion that it can be determined, from the

---

[11] Dr. Dragovic believed that Dr. Cassin "hinted at that" during the trial, "but he did not expand beyond that at all."

-7-

nature of injury alone, that the injury was intentionally inflicted, especially given the age of the child and the physical circumstances.

Moreover, Dr. Dragovic recognized that the right side of the child's brain was swollen due to the medical intervention, but he unequivocally testified that the swelling does not necessarily mean that the injury sustained by the child was intentionally inflicted. Rather, he explained that the brain was evenly swollen at the time of the radiographic imaging according to the hospital reports, and the fact that there was swelling before the surgical intervention does not indicate whether the injury was intentional; instead, the swelling was simply "the reaction of the brain to the injury." Based on all of this evidence, Dr. Dragovic testified that while he perceived no issues with the manner in which Dr. Spitz conducted his neurological examination, he had "problems with [his] interpretations at the time of the trial because there was no evidence" that supported his conclusions.

The prosecution contends that defendant's trial expert "Dr. Cassin testified to everything Dr. Dragovic did even without ever seeing the photographs. Thus, those photographs had absolutely no value to the defense, whether impeachment or otherwise." (Emphasis omitted.) This claim is contrary to the record. As previously explained, Dr. Dragovic provided testimony directly linked to the new photographs that undermined Dr. Spitz's conclusions, particularly on the issue of whether the child's injuries were intentionally inflicted. Additionally, as discussed further below, Dr. Dragovic's testimony was not cumulative to Dr. Cassin's. Further, given Dr. Dragovic's favorable testimony specifically based on the newly disclosed photographs, the clear differences between Dr. Dragovic's and Dr. Cassin's testimony, and the undisputed fact that Dr. Cassin did not have the additional photographs at his disposal when he testified at trial, the trial court's conclusion that the undisclosed photographs were favorable to defendant was not "based on wild speculation," contrary to the prosecution's claims.

## 3. MATERIALITY

To establish materiality, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v Bagley*, 473 US 667, 682; 105 S Ct 3375; 87 L Ed 2d 481 (1985). This standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 US at 434. The question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id*. at 436. [*Chenault*, 495 Mich at 150-151.]

Here, Dr. Dragovic agreed with Dr. Cassin that a subdural hemorrhage, like that present in this case, most likely resulted from the child's head striking a non-yielding surface, and that the child's cause of death was blunt force trauma of the head or complications therefrom, which resulted in brain swelling and a subdural hemorrhage. Likewise, as the prosecution contends, Dr. Cassin and Dr. Dragovic did provide similar opinions regarding whether the evidence in this case

demonstrated that the child's injuries were intentionally inflicted. Dr. Cassin opined that it is always difficult to distinguish between "[a]ccident and intent," and reiterated multiple times that he was not convinced that the child's death was a homicide in this case given the lack of any indication of intent.[12]

However, the undisclosed photographs, and Dr. Dragovic's expert opinion based on those photographs, undermined Dr. Spitz's conclusions regarding the cause of the bruising on the child's brain and, therefore, challenged Dr. Spitz's conclusion that the child's injuries were intentionally inflicted.[13] Dr. Cassin did not provide similar testimony. Dr. Cassin opined generally that "[s]urgical intervention can significantly complicate the injury finding and make the interpretation of injury finding difficult, if not actually impossible, in some details." Then, Dr. Cassin noted that Dr. Spitz's autopsy report indicated that blunt force trauma occurred on the right side of the head, and that surgical intervention also occurred on that side of the head. Notably, he made no reference to the effect of surgical intervention on the bruising on the brain; he only stated that the "surgical events" "cause[d] changes in the *scalp* that had not been there, since the injury or injuries had been sustained."[14] (Emphasis added.) Given this testimony, Dr. Dragovic disagreed that his opinion was the exact same as Dr. Cassin's. Dr. Dragovic explained that he did not believe that Dr. Cassin "had the availability of critical evidence to consider the distinction between the reported bruise of the brain and the artifact created by surgical procedure." Thus, as Dr. Dragovic concluded during the *Ginther* hearing, although Dr. Cassin briefly mentioned the possibility that a medical intervention could affect the medical examiner's conclusions, he did not provide any concrete evidence in this regard that was favorable to defendant, because, in Dr. Dragovic's words, Dr. Cassin "did not have anything to say here it is, here is the evidence."[15]

Therefore, it is apparent that Dr. Dragovic's testimony was not merely cumulative to Dr. Cassin's testimony. It is clear that the undisclosed photographs provided a basis for the defense

---

[12] Notably, though, he expressly testified that he could not rule out homicide in this case, although he later clarified that "without that indication of intent, we can't distinguish specifically between homicide and accident."

[13] Likewise, Dr. Dragovic's testimony also indirectly challenged the validity of Dr. Angelilli's conclusion that the child's injury in this case was non-accidental and intentionally inflicted as well as her conclusion that the child was abused, although these conclusions were not based on the appearance of the brain.

[14] Dr. Cassin similarly stated, "So, by the time [the] autopsy had occurred, there were those conflicting findings. And I say conflicting, only because injuries and surgical change all give the same amount of change, which is *hemorrhage into the scalp*." (Emphasis added.) Dr. Dragovic also recognized that Dr. Cassin was referring to the scalp in his testimony.

[15] In its brief on appeal, the prosecution characterizes Dr. Cassin's testimony regarding bleeding on and around the child's brain as being equivalent to Dr. Dragovic's testimony regarding the bruising of the brain. In reviewing the experts' testimony in its entirety, we conclude that this characterization is unfounded.

to directly challenge Dr. Spitz's conclusion that the autopsy revealed that the child's injuries were intentionally inflicted. Given the importance of expert testimony in cases like this one, which involve issues of abusive head trauma but include no eyewitnesses, no physical evidence confirming the cause of death, and no explicit intent to kill, see *People v Ackley*, 497 Mich 381, 397; 870 NW2d 858 (2015), Dr. Dragovic's testimony regarding the importance of the undisclosed photographs demonstrates that there is a reasonable probability that the outcome of the trial may have been different had the photographs been disclosed to the defense, see *Chenault*, 495 Mich at 150-151. Likewise, given the significance of the photographic evidence, it does not appear that defendant received "a trial resulting in a verdict worthy of confidence" without it. *Id*. at 150-151 (quotation marks and citation omitted).

Thus, the trial court properly concluded that defendant is entitled to a new trial based on the government's failure to disclose the 32 photographs before trial.[16]

### III. CONCLUSION

The trial court properly granted defendant's motion for a new trial because the prosecution's failure to disclose the 32 photographs constituted a *Brady* violation.

Affirmed.

/s/ Michael J. Riordan
/s/ William B. Murphy

---

[16] Given our conclusion that defendant is entitled to a new trial on the basis of a *Brady* violation, we need not consider, in the alternative, whether defendant is entitled to a new trial on ineffective assistance of counsel grounds.