# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LORENZO LAMONT BROWN,

        Defendant-Appellant.

UNPUBLISHED
April 13, 2017

No. 327734
Wayne Circuit Court
LC No. 14-011033-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TERI BERNARD JOHNSON,

        Defendant-Appellant.

No. 327736
Wayne Circuit Court
LC No. 15-000469-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WADDELL POOLE BURNEY,

        Defendant-Appellant.

No. 327814
Wayne Circuit Court
LC No. 14-011033-02-FC

---

AFTER REMAND

Before: WILDER, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

-1-

Defendants Lorenzo Brown, Teri Johnson, and Waddell Burney were tried jointly, before a single jury. The jury convicted defendant Brown of assault with intent to commit murder, MCL 750.83; carrying a weapon with unlawful intent, MCL 750.226; felon in possession of a firearm, MCL 750.224f; and possession of a firearm during commission of a felony, second offense ("felony-firearm"), MCL 750.227b. The jury convicted defendant Johnson of one count each of assault with intent to do great bodily harm less than murder, MCL 750.84; carrying a weapon with unlawful intent; felon in possession of a firearm; and felony-firearm, second offense. It convicted Burney of assault with intent to do great bodily harm less than murder; carrying a weapon with unlawful intent; and felony-firearm, first offense. The trial court sentenced Brown as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 500 to 749 months for the assault with intent to commit murder conviction, and 5 to 10 years each for the carrying a weapon with unlawful intent and felon-in-possession convictions, to be served consecutive to a five-year term of imprisonment for the felony-firearm conviction. The court sentenced Johnson as a fourth-offense habitual offender to concurrent prison terms of 150 to 300 months for the assault with intent to do great bodily harm conviction, 5 to 10 years each for the carrying a weapon with unlawful intent conviction, and the felon in possession conviction, to be served consecutive to a five-year term of imprisonment for the felony-firearm, second offense, conviction. Finally, the court sentenced Burney to concurrent prison terms of 6 to 10 years for the assault conviction and 10 to 60 months for the carrying a weapon with unlawful intent conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. All three defendants appealed as of right and in each case, while retaining jurisdiction, we remanded for the trial court to make appropriate findings of fact, on the record, as to the extent of the closure of the court and to make findings as to the four requirements for the closure of a court as set forth in *People v Kline*, 197 Mich App 165, 169; 494 NW2d 756 (1992). We held Brown's sentencing issues in abeyance pending the proceedings on remand and rejected defendants' remaining claims of error.[1] We now affirm the convictions, but remand defendant Brown's sentencing issues for proceedings not inconsistent with this opinion.

As we noted in our prior opinion, during trial, witness Demond Davis became emotional during cross-examination by Burney's counsel and left the witness stand without permission. Demond informed the trial court that he felt intimidated by defendants' supporters among the courtroom spectators and also stated that he was fearful because people he believed were associated with defendants were parking outside his house, calling him, and following him. As we stated:

> After Demond resumed testifying, Burney's counsel stated for the record that courtroom deputies had removed spectators, including Burney's mother, from the courtroom. All three defendants later moved for a mistrial, arguing that their right to a public trial had been violated. The trial court denied the motion, stating that

---

[1] *People v Brown*, unpublished opinion per curiam of the Court of Appeals, issued November 29, 2016 (Docket No.'s 327734, 327736, and 327814).

it had exercised its discretion to remove spectators "because two very threatened witnesses testified, and one was indeed the victim of the crime."[*People v Brown*, unpublished opinion per curiam of the Court of Appeals, issued November 29, 2016 (Docket No.'s 327734, 327736, and 327814), slip op. at page 2].

All three defendants argued on appeal that the trial court violated their right to a public trial by removing spectators from the courtroom. Because it was not clear from the record whether the closure was partial or total and because the trial court did not satisfy the four requirements set forth in *Kline*, 197 Mich App 169, we remanded the matter to the trial court to make the appropriate findings. This case now returns to us following a hearing held by the trial court on remand.

At the remand hearing, several witnesses testified concerning the closure of the court during defendants' trial on April 30, 2015. Ms. Casper, the prosecutor who represented the people at the trial, testified that prior to trial and after the preliminary examination, one of the testifying witnesses (Demond's uncle) was the victim of a shooting. Based upon recorded jail telephone calls, she believes that the shooting was related to the case. Another witness did not want to testify, expressing "concern" because she knew defendants and their friends. Ms. Casper testified that Demond was concerned about testifying as well and claimed that acquaintances of at least one of the defendants were hanging around his home. As to what transpired during trial with relation to Demond, Ms. Casper testified that he was being cross-examined by one of defendant's counsel when a few people walked into the courtroom and sat in the gallery area behind defendants. Demond looked into the gallery behind where defendants were seated and suddenly ran off the stand. According to Ms. Casper, the judge immediately had the jury taken out of the courtroom and almost simultaneously, deputies removed people from the gallery area behind defendants. She did not recall anyone that had sat on the prosecution's side of the gallery being escorted out or removed from the courtroom. Ms. Casper was permitted to speak to Demond after he left the stand and, as he cried, he told her that he was terrified of one of the men who had walked in and sat behind the defense table, who he identified as "Nate." Ms. Casper recognized Nate's name from calls that had been placed from the jail during which intimidation of the prosecution's witnesses had been discussed. Demond eventually agreed to go back to the stand and testify for his brother, Jamil, who had been shot by defendants.

Ms. Casper testified that the court recessed for lunch to allow things to calm down and when the trial resumed Demond returned to the witness stand to testify, although he was still visibly upset and crying. According to Ms. Casper, the courtroom was not closed when the trial resumed. Ms. Casper testified that the deputies were given a description of the individuals who had come in when Demond ran off the witness stand to keep them out of the courtroom. Ms. Casper testified that this case stood out to her because she had such a difficult time with the witness issues and she was trying the case by herself, with no second chair. Due to the witness difficulties, her colleagues were continuously coming in to check on her, and officers were checking in as well. Ms. Casper testified that she kept her eye on the gallery at all times due to threats to the witnesses and had the court been closed, she would have noticed an absence of people in the gallery. Her recollection is that there were always a couple of people in the gallery, some of whom she did not know, and that the courtroom thus could not have been completely closed. She further recalled the name of a specific civilian who had tried to come in the

courtroom to watch the testimony, but whom the judge made leave in case he had to be recalled as a witness, again indicating to her that the courtroom had not been completely closed.

Ms. Casper further testified that one of the defendant's mothers was one of the persons initially escorted out of the courtroom, but that she was allowed to return at some point. Ms. Casper testified that when Nate and others entered the courtroom, they sat in the mother's vicinity, behind defendants, and at the point when Demond rushed off the witness stand; no one was entirely sure why he had suddenly become so upset. Thus, they felt it was best to escort everyone that had been in the direction in which Demond had looked out of the courtroom until the matter was sorted out.

Defendant Brown testified at the hearing that his mother and several more of his family members were present at his trial on April 30, 2015. Brown testified that at some point during the morning his family was escorted out of the courtroom, though they had done nothing to disrupt the courtroom and that he did not see them in the afternoon when his trial resumed. Brown testified that when his trial resumed the next day, his family members were present in the courtroom. Brown's trial attorney, David Cripps, testified that after Demond ran off the stand, he believes the trial court issued an order closing the courtroom to the public for the day.

Defendant Johnson likewise testified that during his trial on April 30, 2015, his family members and friends were escorted out of the courtroom. He did not see them when the trial resumed that afternoon. Rhonda Johnson, defendant Johnson's sister, testified that she was present for her brother's trial on April 30, 2015, and when a witness walked off the stand, she and the rest of the people in the gallery on the defendant's side were escorted out of the courtroom by a deputy. She testified that she was not allowed back in to the courtroom that day, but did come back on later days. Johnson's trial counsel, Arnold Weiner, testified that when a witness unexpectedly left the stand, he recalls that the trial judge adjourned the matter for a period of time, but could not recall if the courtroom was cleared of the public at any time.

Evan Callahan, trial counsel for defendant Burney, testified that when Demond left the witness stand during his testimony, Burney's mother was escorted out of the courtroom. Callahan objected to her removal and asked that she be allowed back in, and he believes she was thereafter allowed to stay in the courtroom. Callahan could not recall if the courtroom was ultimately cleared.

After the witnesses concluded testifying, the trial judge referred back to the trial transcript and indicated that he had stated that he was leaving the court closed until Demond had finished testifying, indicating that his closure was clearly just a partial closing. The trial judge stated that his reason for the closure was for the protection of the witness as well as for the efficient running of the trial, given that the jury had witnessed everything that the judge, the lawyers, and the defendants had observed.

The hearing record satisfactorily establishes that the closure in this case was partial, rather than total. "A partial closure occurs where the public is only partially excluded, such as when family members or the press are allowed to remain, or when the closure order is narrowly tailored to specific needs." *People v Kline*, 197 Mich App 165, 170 n 2; 494 NW2d 756 (1992)(internal citation omitted). It appears undisputed that only those associated with defendants were cleared from the courtroom. Moreover, the courtroom was cleared of those

-4-

associated with defendants only during Demond's testimony. While Rhonda Johnson testified that after Demond testified she was not allowed back in the courtroom, there is no indication that she attempted to go back into the courtroom and was denied entry. And, there was testimony that at least one defendant's mother was allowed back into the court later in the day and that one witness came back into the courtroom but was asked to leave because he may have been potentially recalled as a witness. The above testimony, as well as the trial judge's statement that he only partially closed the courtroom, is sufficient to establish that the court room was only partially closed.

The articulated reasons for the closure, for the safety of the testifying witness and efficient running of the trial, were substantial enough to justify the partial closure. Demond was clearly shaken by the appearance of a person in the gallery—to the extent that he disrupted the trial. He expressed concern for his safety and Ms. Casper recognized the name of the person who caused Demond fear as a person who had been named or involved in recorded jailhouse threats toward Demond and other prosecution witnesses.

At the conclusion of the evidentiary hearing, the trial court specifically addressed the four factors applicable to the closure of court proceedings set forth in *Kline*, 197 Mich App at 169. As to the first factor, that the closure need address an overriding interest that is likely to be prejudiced, the trial court again indicated that the safety of a witness was at stake and required the partial closure. We agree that this interest was sufficient to justify the partial closure.

The second *Kline* factor requires that the closure be no broader than necessary. *Id*. We agree with the trial court that the closure of the court only while the one witness was testifying was limited and thus not broader than necessary to protect the safety of the testifying witness. With respect to the third factor, the consideration of any reasonable alternatives to the partial closure, the trial judge admitted that he struggled with that factor. He stated that the partial closure was actually begun by deputies trying to control people coming in and out of the courtroom when Demond "astonishingly" just got up and left the stand. The trial judge stated that his concern was that the jury was sheltered from any interaction between witnesses, the deputies, and spectators, so that no prejudice to the defendants occurred and he saw no real alternative but to partially close the courtroom, given that the fear from the witness was happening ten feet away from the jury. Given the unpredictable nature of this occurrence, the speed at which it occurred, and Demond's continued expression of fear, we find that the trial court's determination of no reasonable alternative to a partial closure of the courtroom was sound. Finally, we find that the trial court's articulation on the record of its findings is adequate to support its partial closure of the courtroom, thus satisfying the fourth *Kline* requirement. *Id*.

As we have held that the closing of the courtroom was partial and did not violate any of the defendants' rights to a public trial, we now address defendant Brown's sentencing issues (Docket No. 327734), which we had held in abeyance pending resolution of the remand proceeding.

Brown raised two sentencing issues on appeal. First, he claims that he should not have been sentenced as a habitual offender because the information containing the notice of habitual offender enhancement was not timely filed. We disagree.

MCR 6.112 provides, in pertinent part:

**(B) Use of Information or Indictment.** A prosecution must be based on an information or an indictment. Unless the defendant is a fugitive from justice, the prosecutor may not file an information until the defendant has had or waives a preliminary examination. An indictment is returned and filed without a preliminary examination. When this occurs, the indictment shall commence judicial proceedings.

* * *

**(F) Notice of Intent to Seek Enhanced Sentence.** A notice of intent to seek an enhanced sentence pursuant to MCL 769.13 must list the prior convictions that may be relied upon for purposes of sentence enhancement. The notice must be filed within 21 days after the defendant's arraignment on the information charging the underlying offense or, if arraignment is waived or eliminated as allowed under MCR 6.113(E), within 21 days after the filing of the information charging the underlying offense.

**(G) Harmless Error.** Absent a timely objection and a showing of prejudice, a court may not dismiss an information or reverse a conviction because of an untimely filing or because of an incorrectly cited statute or a variance between the information and proof regarding time, place, the manner in which the offense was committed, or other factual detail relating to the alleged offense.

Brown's preliminary examination was held on December 19, 2014, following which Brown was bound over for trial. He was arraigned in circuit court on December 26, 2014. At that time, he waived reading of the information. The information in the lower court file is dated December 6, 2014, but Brown's circuit court arraignment took place on December 26, 2014. It appears that the information was prepared on December 6, but not filed until after the preliminary examination. The information contained the required notice of intent to seek an enhanced sentence and listed Brown's prior convictions (for attempted receiving or concealing stolen property, attempted first-degree home invasion, and two counts of delivery of less than 50 grams of cocaine). Brown thus fails to establish any noncompliance with MCR 6.112.

Defendant Brown's second sentencing issue is his claim that the trial court improperly engaged in judicial fact-finding to score the sentencing guideline offense variables, thereby increasing his guidelines range, in violation of his rights under the Sixth Amendment. In *People v Lockridge*, 498 Mich 358, 364; 870 NW2d 502 (2015), our Supreme Court held that "the rule from *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), as extended by *Alleyne v United States*, 570 US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2013), applies to Michigan's sentencing guidelines and renders them constitutionally deficient" because of "the extent to which the guidelines *require* judicial fact-finding beyond the facts admitted by the defendant or found by the jury to score offense variables that *mandatorily* increase the floor of the guidelines minimum sentence range . . . ." To remedy this violation, the Court severed MCL 769.34(2) to the extent that it makes a sentencing guidelines range based on judge-found facts mandatory, and held that a guidelines range calculated in violation of *Apprendi* and *Alleyne* is advisory only. *Lockridge*, 498 Mich at 364-365. In *Lockridge*, the Court explained that if the facts "admitted by a defendant or found by the jury verdict were *insufficient* to assess the

minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced[,] . . . an unconstitutional constraint [will have] actually impaired the defendant's Sixth Amendment right." *Id.* at 395. The Court further held that "in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error. *Id.* at 397. This remand procedure was modeled on the procedure adopted in *United States v Crosby*, 397 F3d 103 (CA 2, 2005), cert den 549 US 915; 127 S Ct 260; 166 L Ed 2d 202 (2006). *Lockridge*, 498 Mich at 395-396.

*Lockridge* involved an unpreserved error subject to review for plain error affecting substantial rights, whereas Brown preserved his claims of error under *Alleyne*. Following *Lockridge*, this Court has held that a preserved *Alleyne*/*Lockridge* error must be reviewed to determine if it qualifies as harmless beyond a reasonable doubt. *People v Stokes*, 312 Mich App 181, 198; 877 NW2d 181 (2015), appeal held in abeyance ___ Mich ___; 878 NW2d 886 (2016); *People v Terrell*, 312 Mich App 450, 464; 879 NW2d 294 (2015), appeal held in abeyance 878 Mich 480; ___ NW2d ___ (2016). This Court further held that in order to determine whether the error was harmless, a *Crosby* remand is appropriate, even in the absence of evidence that judicial fact-finding increased the minimum sentence, if the trial court's use of the sentencing guidelines was mandatory at the time of sentencing. *Terrell*, 312 Mich App at 466-467.

Brown argues that the trial court's scores for offense variable (OV) 1, OV 2, OV 3, OV 4, OV 6, OV 7, and OV 19 were not based on facts that he admitted or that were found by the jury.

The trial court scored the sentencing guidelines for armed robbery, a class A offense. MCL 777.16y. Brown received a total of 175 offense variable points, placing him in OV Level VI (100 or more points), which combined with his placement in Prior Record Variable Level E, resulted in a sentencing guidelines range of 225 to 375 months or life. MCL 777.62. Because Brown was sentenced as a fourth-offense habitual offender, MCL 769.12, the upper limit of the guidelines range was increased by 100 percent, MCL 777.21(3)(c), resulting in an enhanced guidelines range of 225 to 750 months. MCL 777.62. The trial court sentenced defendant within that range to a minimum term of 500 to 749 months.

At defendant's sentencing, when asked about challenges to the scoring of offense variables, defendant's attorney expressly stated that he agreed with the scoring of OV's 1, 2, 3 and 4. This express approval waived review of this issue with respect to those variables. A waiver extinguishes any error, leaving no error to review. *People v Vaughn*, 491 Mich 642, 663; 821 NW2d 288 (2012).[2]

---

[2] OV's 1 and 2 were also supported by the jury's verdict and did not require judicial fact-finding. OV 1 concerns aggravated use of weapon. The prosecutor's sole theory was that defendants fired guns at Dismuke and wounded him. There was no basis for the jury to convict Brown unless it found that defendants discharged one or more firearms. OV 2 concerns the lethal potential of a weapon possessed or used. Brown's convictions of carrying a weapon with

Offense variable 6 (offender's intent to kill or injure) was scored at 50 points, which is the proper score where "[t]he offender had premeditated intent to kill or the killing was committed while committing or attempting to commit" any of the felonies enumerated in the statute, none of which are applicable here. MCL 777.36(1)(a). Although an intent to commit murder is a necessary element of defendant's conviction for assault with intent to commit murder (MCL 750.83), that statute does not require a *premeditated* intent to kill. Accordingly, OV 6 was not based on any finding inherent in the jury's verdict.

The court assessed 50 points for OV 7 (aggravated physical abuse). This score is properly assigned where "[a] victim was treated with sadism, torture, excessive brutality or similarly egregious conduct designed to substantially increase the fear and anxiety a victim suffered." MCL 777.37(1)(a). No such finding is inherent in the jury's verdict. Similarly, the trial court scored 10 points for OV 19 on the basis that Brown "interfered with or attempted to interfere with the administration of justice," but no such finding was implied by the jury's verdict. MCL 777.49(c).

The total sum of preserved, appealable OV point challenges that were dependent on judicial fact-finding is 110 points. Without these points, defendant's total OV score would be 65 points, placing him in OV Level IV (60-79 points), which combined with Brown's placement in PRV Level E, would result in an enhanced minimum sentence range of 135 to 450 months. MCL 777.62; MCL 777.21(3)(c). Brown has thus demonstrated that an unconstitutional constraint actually impaired his Sixth Amendment rights. *Lockridge*, 498 Mich at 395. Because Brown was sentenced before *Lockridge* was decided, and his placement in OV Level VI cannot be sustained on the basis of facts admitted by Brown or necessarily found by the jury, remand is warranted to determine if the sentencing error is harmless. *Stokes*, 312 Mich App at 198.

The prosecutor argues that the Supreme Court in *Lockridge* did not "strip[] away the trial court's power to score the guidelines based on judicial fact finding." The prosecutor relies on this footnote from *Lockridge*:

> Our holding today does nothing to undercut the requirement that the highest number of points possible *must be* assessed for all OVs, whether using judge-found facts or not. See MCL 777.21(1)(a) (directing that the offense variables applicable to the offense category at issue be scored); see also, e.g., MCL 777.31(1) (directing that the "highest number of points" possible be scored); MCL 777.32(1) (same); etc. [*Id*. 498 Mich at 392 n 28 (emphasis in original).]

This footnote relates to this paragraph from the Court's opinion:

> Accordingly, we sever MCL 769.34(2) to the extent that it is mandatory and strike down the requirement of a "substantial and compelling reason" to depart from the guidelines range in MCL 769.34(3). When a defendant's sentence is calculated using a guidelines minimum sentence range in which OV's

---

unlawful intent, felon in possession of a firearm, and felony-firearm demonstrate that the jury found beyond a reasonable doubt that Brown was in possession of a firearm.

have been scored on the basis of facts not admitted by the defendant or found beyond a reasonable doubt by the jury, the sentencing court may exercise its discretion to depart from that guidelines range without articulating substantial and compelling reasons for doing so. A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness. *Booker*, 543 US at 261, 125 S Ct 738. Resentencing will be required when a sentence is determined to be unreasonable. Because sentencing courts will hereafter not be *bound* by the applicable sentencing guidelines range, this remedy cures the Sixth Amendment flaw in our guidelines scheme by removing the unconstitutional constraint on the court's discretion. Sentencing courts must, however, continue to consult the applicable guidelines range and take it into account when imposing a sentence. Further, sentencing courts must justify the sentence imposed in order to facilitate appellate review. *People v Coles,* 417 Mich 523, 549; 339 NW2d 440 (1983), overruled in part on other grounds by *People v Milbourn,* 435 Mich 630, 644; 461 NW2d 1 (1990). [*Lockridge*, 498 Mich at 391-392.]

Although the prosecutor is correct that courts may score the guidelines on the basis of judge-found facts, the prosecutor ignores that such scoring is permitted only so long as the guidelines are deemed advisory, and that the guidelines were mandatory at the time Brown was sentenced. It is the mandatory application of the guidelines, not judicial fact-finding, which establishes the unconstitutional constraint on the trial court's discretion. Consequently, this case should be remanded to the trial court for reconsideration of Brown's sentences in accordance with *Lockridge*.

On remand, the trial court should determine whether it would have imposed a materially different sentence but for the unconstitutional constraint on its discretion because of the mandatory application of the guidelines at the time of Brown's original sentencing. *Lockridge*, 498 Mich at 397. The trial court should follow the procedure described in *Lockridge*. Brown must be given the option of promptly notifying the trial judge that resentencing will not be sought. If notification is not received in a timely manner, the trial court shall continue with the proceeding. If the trial court determines that it would have imposed the same sentences absent the unconstitutional constraint on its discretion, it may reaffirm the original sentences. If, however, the court determines that it would not have imposed the same sentences absent the unconstitutional constraint on its discretion, it should resentence Brown. *Id.* at 396-399.

Affirmed, but defendant Brown's sentencing issues are remanded to the trial court for proceedings not inconsistent with this opinion. We do not retain jurisdiction.

/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto